EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Yuserdy Salvá Santiago<br><br>Demandante-Peticionaria<br><br>v.<br><br>Jason Torres Padró<br><br>Demandado-Recurrido | Certiorari<br><br>2007 TSPR 101<br><br>171 DPR \_\_\_\_ |

Número del Caso: CC-2006-173

Fecha: 1 de junio de 2007

Tribunal de Apelaciones:

> Región Judicial de Utuado Panel X

Juez Ponente:

> Hon. Ismael Colón Birriel

Abogado de la Parte Peticionaria:

> Lcdo. Domingo Donate Pérez

Abogado de la Parte Recurrida:

> Lcdo. Gabriel Rubio Castro

Materia: Divorcio y Alimentos

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Yuserdy Salvá Santiago

  Demandante-Peticionaria

       v.                 CC-2006-173    Certiorari

Jason Torres Padró

  Demandado-Recurrido

Opinión del Tribunal emitida por el Juez Presidente señor Hernández Denton

San Juan, Puerto Rico a 1 de junio de 2007.

El recurso de autos nos permite aclarar si existe en nuestro ordenamiento jurídico la causal de ruptura irreparable a la luz de lo resuelto en Figueroa Ferrer v. Estado Libre Asociado, 107 D.P.R. 250 (1978). Respondemos dicha interrogante en la negativa.

I

La Sra. Yuserdy Salvá Santiago (en adelante, señora Salvá Santiago o peticionaria) presentó una demanda de divorcio por ruptura irreparable contra su esposo, el Sr. Jason Torres Padró[1]. Antes de que el señor Torres Padró fuera emplazado, el

---

[1] Junto con la demanda de divorcio, la señora Salvá Santiago presentó una moción solicitando alimentos *pendente lite* y honorarios de abogado, sobre la

tribunal de instancia desestimó la demanda sin perjuicio. Concluyó que, conforme lo resuelto en Figueroa Ferrer, en Puerto Rico se puede presentar una solicitud de divorcio por la causal de ruptura irreparable, pero que ésta se tiene que dar en el contexto de un proceso no adversativo donde medie una petición conjunta suscrita por ambos cónyuges[2].

Insatisfecha con el dictamen, la señora Salvá Santiago acudió ante el Tribunal de Apelaciones, el cual confirmó la determinación. La señora Salvá Santiago acude ante este Tribunal por entender que erraron ambos foros al concluir que el divorcio por ruptura irreparable se puede dar sólo en el contexto de un proceso no contencioso. Sostiene, por el contrario, que la causal de ruptura irreparable se puede tramitar de forma adversativa y que no reconocerlo así violenta su derecho a la intimidad.

Al resolver la controversia de autos tomamos conocimiento judicial de que algunos paneles del Tribunal de Apelaciones han validado decretos de divorcio por ruptura irreparable en procesos adversativos, mientras que otros se han negado a validar esta causal[3]. Por la importancia de

---

cual no habremos de expresarnos porque carecemos de detalles para disponer de la misma.

[2] Posteriormente, el tribunal emitió una Resolución declarando académica la solicitud de alimentos *pendente lite* y de honorarios de abogado.

[3] Así, por ejemplo, el Tribunal de Apelaciones ha validado decretos de divorcio por ruptura irreparable en procesos adversativos en los siguientes casos: Arias Briceño v. Esusy Esusy, KLAN-2004-274 (Panel de la Región Judicial de San Juan); Díaz Denis v. Fernández Aponte, KLAN-2004-559 (Panel de la Región Judicial de Caguas); Moreno Rivera v. Rivera

esta controversia y con el propósito de pautar el derecho aplicable expedimos el recurso solicitado y procedemos a resolverlo en sus méritos.

II

A

Hace casi tres décadas resolvimos en _Figueroa Ferrer_ que el derecho constitucional a la intimidad permite a los ciudadanos divorciarse _por consentimiento mutuo_ sin tener que expresar las razones de su determinación. En esa ocasión, expresamente declaramos inconstitucional la disposición del Artículo 97 del Código Civil que prohibía el acuerdo entre los cónyuges para divorciarse por violar las Secs. 1 y 8 del Art. II de la Constitución del Estado Libre Asociado. Allí nos planteamos si, en aras de conferir el respeto debido a la dignidad e intimidad del ser humano y a la propia integridad de los procesos judiciales, se debía reconocer formalmente la realidad de que muchas parejas se divorciaban mediante causales contenciosas simulando adversidad aún cuando ya existía un acuerdo entre ellos. _Id._

---

_Ramírez_, KLAN-2004-717 (Panel de la Región Judicial de Mayagüez) y _Pérez Soto v. López Acevedo_, KLAN-2002-681 (Panel de la Región Judicial de Aguadilla). Por el contrario, otros paneles se han negado a sostener decretos de divorcio bajo dicha causal cuando no se ha cumplido con los requisitos del proceso de consentimiento mutuo. No obstante, incluso estos paneles entienden que en _Figueroa Ferrer_ reconocimos dos causales independientes, pero que a ambas les aplica el proceso allí establecido. Así ocurrió, por ejemplo, en los casos _Planadeball Rosario v. Viera Rodríguez_, KLCE-2005-215 (Panel de la Región Judicial de Carolina); _Santiago López v. Hernández Morales_, KLAN-2005-1421 (Panel de la Región Judicial de Carolina) y _Ramírez Hernández v. Jiménez Ríos_, KLAN-2004-1144 (Panel de la Región Judicial de San Juan).

a la pág. 271. Conforme a ese análisis, sostuvimos que el Estado está impedido de obligar a dos seres humanos a permanecer atados cuando **ambos reconocen** que la convivencia se ha hecho imposible porque el vínculo entre ellos está irremediablemente disuelto. *Id*. a la pág. 275.

Por otra parte, establecimos que no se aceptaría petición alguna de divorcio bajo estos principios sin que las partes incluyeran las **estipulaciones** correspondientes sobre la división de sus bienes, el sustento de las partes y otras consecuencias del divorcio. *Id*. a la pág. 277. Más aún, **en vista del carácter obligatorio que le conferimos al consenso entre los cónyuges**, dispusimos que si dentro de treinta (30) días a partir de la sentencia de divorcio alguna de las partes retiraba su aceptación, se dejaría sin efecto la determinación. *Id*.; véase, además, *Guías para Uniformar el Procedimiento de Divorcio por Consentimiento Mutuo*, Conferencia Judicial, 1988, pág. 39. **De esta forma, nos aseguramos que hasta el último momento la decisión tomada fuese consensual y que solamente adviniera final y firme el divorcio si ambos mantenían su decisión de disolver el matrimonio.**

Así, al amparo de nuestro ordenamiento constitucional en Figueroa Ferrer acogimos la normativa prevaleciente en otras jurisdicciones de permitir el divorcio consensual. Para llegar a ese resultado, hicimos un extenso análisis del estado de derecho vigente tanto en Europa como en los Estados Unidos y concluimos que en la mayoría de las

jurisdicciones la tendencia era hacia el divorcio no culposo de naturaleza consensual.

De hecho, en esa decisión –y al amparo del análisis de derecho comparado realizado– reconocimos que, aunque la ruptura irreparable a veces se tramitaba de forma adversativa, lo que muchas veces había detrás de ella era un consenso entre los cónyuges sobre el quebrantamiento insalvable del vínculo matrimonial. *Id*. a la pág. 265.

En dicha opinión también expresamos que muchas veces la introducción del concepto de ruptura irreparable constituyó una aceptación sutil del consentimiento mutuo como método para la disolución del matrimonio. *Id*. a la pág. 265. Indicamos que Suecia era ejemplo de ello, toda vez que allí la demostración de la ruptura irreparable era un requisito del divorcio por consentimiento. *Id*. a la pág. 268. También expresamos que Francia contemplaba dos causales de divorcio sin contenido de culpa, a saber, el consentimiento mutuo y la ruptura irreparable. *Id*. a la pág. 269. No obstante, sólo abundamos en los rasgos del divorcio por consentimiento, precisamente porque en ese país se trataba de dos causales distintas.

Además, en esa decisión enunciamos la existencia de una tendencia general a reconocer el divorcio no culposo mediante la institución de la causal de ruptura irreparable o la de consentimiento mutuo. Sostuvimos que, en ambos casos, la mayoría de las jurisdicciones intentaba escudar a

las partes de la necesidad de depender de causales culposas, así como de ventilar su vida íntima ante las cortes. *Id*.

Tal como surge del recuento anterior, la mayor parte de las ocasiones en que nos referimos al concepto de ruptura irreparable en <u>Figueroa Ferrer</u> lo hicimos en función del estudio de la evolución del divorcio culposo al divorcio sin culpa, y para ejemplificar que la tendencia mayoritaria en el mundo era hacia el reconocimiento del divorcio consensual <u>cuando las parejas acordaban</u> que diferencias irreconciliables habían ocasionado la ruptura irreparable del vínculo matrimonial. De la normativa allí estudiada se desprende, además, que –en ocasiones– detrás de un proceso adversativo por ruptura irreparable, lo que existía era un consenso entre los cónyuges sobre la alegada ruptura y que, en otras instancias, la demostración de la ruptura irreparable era necesaria para lograr el divorcio por consentimiento. Dada la relación que con alguna frecuencia observamos entre ambas causales –a nivel práctico y probatorio– y, en vista de la existencia de una modalidad consensual del divorcio por ruptura irreparable, afirmamos, a modo de conclusión, que "[l]a Constitución del ELA ampara el derecho de los puertorriqueños a proteger su dignidad y vida íntima en los procedimientos de divorcio **mediante la expresión de la mutua decisión de divorciarse o la consignación de ruptura irreparable de los nexos de convivencia matrimonial**" (énfasis suplido). *Id*. pág. 276.

De hecho, también en la actualidad algunos estados de Estados Unidos poseen un esquema consensual para tramitar el divorcio por ruptura irreparable. La mayoría de los estados que han optado por este concepto, han acogido en sus estatutos el proceso propuesto en la ley uniforme conocida como el *Uniform Marriage and Divorce Act*. Véase, por ejemplo, Arz. Rev. Stat. § 25-316 y Colo. Rev. Stat. Ann. § 14-10-110. El estatuto uniforme establece la ruptura irreparable como única base para el divorcio y provee para que se haga por mutuo acuerdo. No obstante, en aquellos casos en que no hay acuerdo, el tribunal debe examinar los factores relevantes para determinar si el matrimonio está irremediablemente disuelto. 9A Uniform Laws Annotated, § 305. Incluso, algunos estados han ido más allá y han establecido que la única forma de obtener un divorcio por ruptura irreparable es mediante un acuerdo entre los cónyuges. Véase, por ejemplo, Tenn. Code Ann. § 36-4-103 y W. Va. Code Ann. § 48-5-201.

Partiendo del análisis expuesto, y tomando en cuenta el estudio comparado que hicimos en Figueroa Ferrer, *supra*, **resolvemos que cuando en esa decisión mencionamos la ruptura irreparable como posible medio de disolución matrimonial, lo que hicimos fue acoger la modalidad consensual de dicha causal para hacerla formar parte del divorcio por consentimiento mutuo.** Por tanto, coincidimos con el tratadista Raúl Serrano Geyls en cuanto sostiene que "[l]a causa no culposa de **ruptura irreparable no existe** en

P[uerto] R[ico]…". R. Serrano Geyls, *Derecho de Familia de Puerto Rico y Legislación Comparada*, Primera Ed., Programa de Educación Jurídica Continua, San Juan, Vol. I, pág. 619. Más bien, lo que adoptamos en Figueroa Ferrer fue la causal de consentimiento mutuo, pero reconocimos que cuando ambos cónyuges aceptan y consignan la ruptura irreparable del matrimonio, estamos ante una modalidad del divorcio por consentimiento mutuo y, por tanto, en esos casos se puede tramitar el divorcio conforme el procedimiento establecido en Figueroa Ferrer.

Esto significa que el proceso de consentimiento mutuo se puede dar en dos contextos: (1) cuando **ambos** cónyuges expresan el interés mutuo de disolver el matrimonio, o (2) cuando **ambos** cónyuges consienten en divorciarse y sólo exponen como causa la existencia de una ruptura irreparable en el vínculo matrimonial. Ahora bien, en ambas modalidades (consentimiento mutuo mediante la expresión de la mutua decisión de divorciarse o consentimiento mutuo mediante la consignación de la existencia de una ruptura irreparable del vínculo matrimonial) hay que cumplir con los requisitos formales establecidos en Figueroa Ferrer, a saber, la presentación de una petición conjunta juramentada donde se solicite el divorcio y se incluyan las estipulaciones sobre las consecuencias del mismo.

Conforme a lo anterior, no podemos acceder al pedido de la peticionaria, en cuanto nos invita a resolver que en Figueroa Ferrer adoptamos, además del consentimiento mutuo,

una modalidad **no consensual** del divorcio por ruptura irreparable. Como vimos antes, la Opinión emitida en Figueroa Ferrer está cimentada en la presencia de **consenso entre los cónyuges.** Todos y cada uno de los rasgos del proceso que allí establecimos gira en torno al reclamo de unos cónyuges que deseaban divorciarse por **mutuo acuerdo** sin tener que revelar los detalles de su vida íntima al fingir una disputa que no existía, lacerando -además- la dignidad del tribunal. Si tomamos en cuenta esos detalles, constituiría un contrasentido sostener que en Figueroa Ferrer también reconocimos una causal de índole adversativa cuando el proceso que establecimos en la Opinión **implica y requiere consenso** entre los cónyuges. Más aún, afirmar tal cosa implicaría menospreciar el texto mismo de la Opinión, y sostener que este Tribunal -a fin de cuentas- adoptó dos causales pero reguló solamente una de ellas.

B

Por otro lado, si acogiéramos la postura de la peticionaria tendríamos que afirmar que en Figueroa Ferrer este Tribunal adoptó dos modalidades de divorcio con rasgos absolutamente contrapuestos, poniendo en riesgo las protecciones que allí quisimos conceder. Si bien la peticionaria alega que no reconocer la ruptura irreparable como causal adversativa violentaría su derecho a la intimidad porque no desea divulgar las razones de su decisión, lo cierto es que **reconoce que la parte adversa tendría derecho a expresar si, en efecto, el matrimonio está**

**irremediablemente disuelto.** Por tanto, el proceso que ésta invoca al amparo del concepto de ruptura irreparable es uno donde <u>median partes adversas</u>. Bajo ese esquema, sus alegaciones admitirían contestación, y la parte contraria tendría derecho a presentar prueba a su favor para apoyar o desvanecer la teoría de que existe un rompimiento irreparable en el vínculo matrimonial. Siendo así, si accediéramos a las pretensiones de la peticionaria **añadiríamos una nueva causal contenciosa** que requeriría la divulgación de detalles del rompimiento matrimonial, so pretexto de que se pruebe la existencia de una ruptura irreparable. Ello, sin duda, afectaría su propósito de evitar la divulgación de las razones que la mueven a solicitar el divorcio.

Ahora bien, el hecho de que el proceso solicitado por la peticionaria no necesariamente evite la divulgación de las razones del rompimiento, **no significa que debamos adoptar el criterio expuesto en las opiniones disidentes, a los efectos de que la petición unilateral de un cónyuge debe ser suficiente para lograr un decreto de divorcio. Por el contrario, estimamos que tal proceder sería contrario a los rasgos que distinguen la institución del matrimonio y atentarían contra las garantías mínimas requeridas por el debido proceso de ley.**

Sabido es que el debido proceso de ley en su vertiente procesal le garantiza al ciudadano que la interferencia con sus intereses de libertad y propiedad se harán a través de

un procedimiento justo y equitativo. Hernández v. Hon. José Izquierdo, res. el 11 de abril de 2005, 2005 TSPR 38; Rivera Rodríguez & Co. v. Lee Stowell, 133 D.P.R. 881 (1993). Entre los requisitos que todo proceso adversativo debe garantizar para satisfacer las exigencias del debido proceso se encuentran, precisamente, **la oportunidad de ser oído**; el derecho a contra-interrogar y el derecho a examinar la evidencia presentada por la parte contraria. Rosario v. Depto. de la Familia, res. el 21 de junio de 2002, 2002 TSPR 84; Rivera Rodríguez & Co. v. Lee Stowell, *supra*; Rivera Santiago v. Srio. de Hacienda, 119 D.P.R. 265 (1987).

No obstante lo anterior, los criterios expuestos en las opiniones disidentes –en aras de vindicar el derecho a la intimidad de uno de los cónyuges– desatienden el derecho también constitucional del otro cónyuge a que la interferencia con sus intereses libertarios y propietarios se haga a través de un debido proceso de ley. En la medida en que adoptarían el concepto de ruptura irreparable como modalidad de divorcio unilateral, ignoran –entre otras cosas– la normativa constitucional de concederle a la otra parte su derecho a ser oído.

De otra parte, no compartimos los criterios expuestos en las referidas opiniones en cuanto a que el Estado no se puede inmiscuir en la decisión de un cónyuge de divorciarse unilateralmente. Contrario a esa posición, en la propia Opinión emitida en Figueroa Ferrer (después de declarar inconstitucional la disposición del Código Civil que le

impedía a los cónyuges llegar a un acuerdo para lograr un divorcio), aclaramos que **"[n]ada de lo anterior significa que el divorcio es asunto exclusivo de las partes**, sujeto a su puro capricho y antojo"**. Figueroa Ferrer, *supra*, a la pág. 276 (énfasis suplido). **En vista de ello, reconocimos que no era posible dejar la determinación y el trámite del divorcio al albedrío y voluntad de las partes**. Más bien, al así resolver, partimos de la premisa de que los tribunales tendrían un rol activo en tales procedimientos.

Ello responde, sin duda, a los rasgos mismos que se le han conferido a la institución del matrimonio. En nuestro ordenamiento, el matrimonio proviene de un acto **solemne** de naturaleza consensual que requiere el cumplimiento de determinadas formalidades. Art. 68 del Código Civil, 31 L.P.R.A. sec. 221. **El mismo se define como "una institución civil que procede de un contrato en virtud del cual un hombre y una mujer se obligan mutuamente a ser esposo y esposa, y a cumplir el uno para con el otro los deberes que la ley les impone"**. *Id*. (énfasis suplido) Es decir, el matrimonio supone la existencia de una serie de obligaciones <u>recíprocas</u> que tienen su origen en el carácter contractual de la figura. Al momento de contraer dicho compromiso, ambos decidieron voluntariamente unir sus vidas en la búsqueda de un camino común. **Por tanto, el matrimonio y su ulterior disolución no pueden quedar al arbitrio de un solo cónyuge.**

De conformidad con esta normativa, nuestro ordenamiento ha establecido que, una vez contraído el matrimonio, éste sólo puede ser disuelto de la manera y en los casos específicos reconocidos por la ley y la jurisprudencia. Cosme v. Marchand, 121 D.P.R. 225 (1988).

Más aun, hemos expresado que el matrimonio es la base de la familia y que, por tanto, constituye el eje central de la sociedad. Cónsono con ello, hemos reconocido que en nuestra sociedad existe un interés público en la conservación del matrimonio. Pueblo v. Tribunal Superior, 99 D.P.R. 30 (1970). Por tanto, debe quedar claro que la protección de la unión matrimonial, en efecto, constituye un interés apremiante del Estado. Almodóvar v. Méndez Román, 125 D.P.R. 218 (1990). Es por eso que **no podemos evaluar livianamente las rutas para su disolución**. Por el contrario, su carácter de institución solemne y fundamental justifica que el Estado imponga requisitos y salvaguardas para regular el paso que llevará a su disolución.

En vista de todo lo anterior, no compartimos las posturas expuestas en las opiniones disidentes. Tal como surge del análisis anterior, las mismas son contrarias a la legislación aplicable que requiere que se pruebe una causa reconocida para disolver el matrimonio y contravienen, además, el requisito legal de que sea el tribunal el que decida si procede decretar la disolución solicitada.

**A fin de cuentas, endosar sus posiciones implicaría la adopción de un divorcio instantáneo** que tendría efectos

jurídicos tan pronto un cónyuge presente la demanda, a pesar de que nuestro ordenamiento requiere el cumplimiento con ciertos requisitos. **Más aún, esto conllevaría darle efecto inmediato a una petición de divorcio unilateral sin darle al otro cónyuge el derecho a ser oído que garantiza el debido proceso de ley**. Definitivamente, no podemos avalar todo ese automatismo que no armoniza con el carácter contractual, solemne y fundamental del matrimonio.

### III

Finalmente, debemos señalar que el esquema contemplado en Figueroa Ferrer –y aclarado en algunos extremos en esta ocasión– no impide que una acción de divorcio iniciada bajo una causal contenciosa pueda ser encauzada bajo el proceso de consentimiento mutuo. En esos casos, cuando se presenta una demanda bajo cualquiera de las causales establecidas en el Código Civil, y luego las partes se ponen de acuerdo, no es necesario desestimar la demanda para volver a iniciar el trámite mediante una petición conjunta. Más bien, se le debe conceder una oportunidad a los cónyuges para que enmienden los escritos, de manera que cumplan con las formalidades establecidas en Figueroa Ferrer. Es decir, en tales casos se le debe conceder un término a las partes para que suscriban una petición conjunta donde se incluyan los acuerdos sobre las consecuencias del divorcio.

Por otro lado, en casos como el de autos, donde lo que se invoca para sostener la demanda de divorcio es una causal inexistente en nuestro ordenamiento, procede permitir que se

enmiende la misma para invocar una causal reconocida. Sólo si el cónyuge demandante se niega a enmendar la demanda al amparo de una causal reconocida, procederá desestimar la misma.

Con esto en mente, pasamos a disponer concretamente del caso ante nuestra consideración.

IV

Al aplicar las normas expuestas al caso de autos, resulta forzoso concluir que la peticionaria, señora Salvá Santiago, no podía tramitar su demanda de divorcio bajo la causal de ruptura irreparable, toda vez que dicha causal no fue adoptada propiamente en Figueroa Ferrer ni se ha hecho mediante legislación. Dicho precedente incorporó el concepto de ruptura irreparable a nuestro sistema de divorcio, únicamente, como modalidad de la causal de consentimiento mutuo en los casos en que hay acuerdo entre los cónyuges sobre la alegada ruptura irreparable y así desean expresarlo. Sin embargo, como hemos indicado, en tales instancias también se tienen que cumplir los requisitos formales establecidos en Figueroa Ferrer, los cuales están basados en la presencia de consenso entre los cónyuges, por lo que se requiere la presentación de una petición conjunta donde se incluyan los acuerdos sobre las consecuencias del divorcio.

Ahora bien, conforme hemos señalado, el tribunal en este caso no debió desestimar la demanda presentada por la señora Salvá Santiago. Más bien, debió permitirle enmendar

el escrito invocando una causal reconocida en nuestro ordenamiento y, si ésta se negaba a hacerlo, entonces procedía desestimar la demanda.

**Finalmente, conviene aclarar que mediante este dictamen no invalidamos las sentencias emitidas por ruptura irreparable que hayan advenido finales y firmes. Ello en vista de que son dictámenes emitidos por tribunales con jurisdicción y competencia que se han fundamentado en un error de derecho y que, por ende, no están viciados de nulidad.**

V

Por los fundamentos expuestos, revocamos la Sentencia del Tribunal de Apelaciones y, en consecuencia, la del Tribunal de Primera Instancia, en cuanto desestimó la demanda presentada por la peticionaria al amparo de una causal inexistente, cuando lo que procedía era permitir la enmienda del escrito para invocar una de las causales reconocidas en nuestro ordenamiento. En vista de ello, se devuelve el caso al tribunal de instancia para que proceda conforme lo señalado.

Se dictará Sentencia de conformidad.

FEDERICO HERNÁNDEZ DENTON
Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Yuserdy Salvá Santiago

   Demandante-Peticionaria

         v.                          CC-2006-173     Certiorari

Jason Torres Padró

   Demandado-Recurrido


SENTENCIA

San Juan, Puerto Rico, a 1 de junio de 2007.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se revoca la Sentencia del Tribunal de Apelaciones y, en consecuencia, la del Tribunal de Primera Instancia, en cuanto desestimó la demanda presentada por la peticionaria al amparo de una causal inexistente, cuando lo que procedía era permitir la enmienda del escrito para invocar una de las causales reconocidas en nuestro ordenamiento. En vista de ello, se devuelve el caso al tribunal de instancia para que proceda conforme lo señalado.

Así lo pronuncia y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri emitió Opinión de Conformidad. Las Juezas Asociadas señoras Fiol Matta y Rodríguez Rodríguez disienten con Opiniones escritas.


                    Aida Ileana Oquendo Graulau
                    Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Yuserdy Salvá Santiago

    Demandante-Peticionaria

      vs.                    CC-2006-173    Certiorari

Jason Torres Padró

    Demandado-Recurrido

Opinión de Conformidad emitida por el Juez Asociado señor FUSTER BERLINGERI.

San Juan, Puerto Rico, a 1 de junio de 2007.

En general, estoy conforme con la Opinión del Tribunal en el caso de autos. Por las razones señaladas en dicha Opinión, comparto el criterio de que en nuestro ordenamiento jurídico no existe como causal no culposa de divorcio la modalidad no consensual de ruptura irreparable del vínculo matrimonial.

No obstante, he creído menester añadir algo más a lo que se expresa en la Opinión mayoritaria, relativo a los límites de la fundamental libertad a la autonomía personal. Nuestra Constitución no reconoce expresamente un derecho a la personalidad o el derecho a la libertad personal como tal pero no cabe duda de que en el entramado de nuestra

abarcadora Carta de Derechos se encuentra una amplia protección a la autonomía de las personas para tomar decisiones sobre su vida íntima o personal. Tal autonomía personal, sin embargo, como todos los derechos fundamentales, **no es absoluta**. Está sujeta a límites que se originan en la exigencia radical de toda Carta de Derechos de proteger igualmente las libertades de cada cual; es decir, de salvaguardar los derechos de los demás.

La autonomía personal se ejerce de ordinario de la forma más cabal precisamente cuando un ser humano decide vincularse a otro en matrimonio, con los privilegios y las responsabilidades que ello apareja. El lazo conyugal auténtico supone una decisión de cada uno de los esposos de hacer **una vida común**, procurando en tal afán la plenitud de la vida propia. Pero entonces el desarrollo personal integral se transforma en una búsqueda común en la que cada uno de los cónyuges empeña su autonomía personal en el logro del desarrollo integral del otro. Por ello, la esencia del vínculo matrimonial es la **reciprocidad**.

Claro está, el proyecto de vida común no es fácil de plasmar, y con frecuencia resulta en un fracaso. En ese momento, sin embargo, al surgir lo que parece ser una ruptura irreparable, todavía persiste moral y jurídicamente el esencial voto de reciprocidad, prestado al casarse. Por ello, la decisión de disolver el vínculo matrimonial **tiene que ser necesariamente de ambos cónyuges**, si es que ha de tener algún viso de legitimidad. Así como el lazo

matrimonial surgió de modo consustancial de la decisión de las dos personas en el vínculo, su terminación debe ser producto también de la decisión de ambos, salvo que medie culpa o requerimiento legal. De otro modo se pone en grave riesgo el elemento esencial de la reciprocidad, que es como poner en riesgo la posibilidad misma del matrimonio como institución social.

En resumen, pues, lo que se creó sólo por la concurrencia de dos autonomías de voluntad, sólo puede resolverse del mismo modo. En un ámbito constituido por la reciprocidad no cabe la disolución unilateral. El divorcio por ruptura irreparable sólo procede cuando las dos personas involucradas coinciden en que tal ruptura ha ocurrido. De otro modo, la pretensión de disolver el vínculo unilateralmente es injusta y violatoria de la autonomía de la otra persona.


JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Yuserdy Salva Santiago
        Peticionaria

                                                *Certiorari*
        v.                          CC-2006-173

Jason Torres Padró

        Recurrido

Opinión Disidente emitida por la Jueza Asociada señora FIOL MATTA

En San Juan, Puerto Rico, a 1 de junio de 2007.

> *La libertad está en ser*
> *dueños de la propia vida.*
> —Platón

> *Sin libertad no hay lo que*
> *llamamos persona.*
> —Octavio Paz, La llama doble.

A través de una Opinión, a mi juicio incompleta, la Mayoría del Tribunal ha evadido la aplicación de las doctrinas que en virtud de nuestra evolución jurídica en el campo del Derecho Privado, particularmente en torno a la acción de divorcio, nos pareció prudente articular hace varias décadas. Me refiero a las doctrinas desarrolladas a la luz del derecho a la autonomía personal consagrado en nuestro

ordenamiento como corolario de los derechos a la intimidad y dignidad humana. Al proceder de esta manera, la mayor parte de los miembros de esta Curia ha limitado injustificadamente el cauce de una obligada corriente jurisprudencial provocando una conclusión jurídica desfasada en los tiempos actuales.

**La Opinión de la Mayoría abona a la falta de contextualización histórica, social y cultural característica del trato reciente de este Tribunal a diversas áreas del derecho de la persona.** Nuestro Derecho civil queda, una vez más, restringido a una intención legislativa centenaria, extraña y obsoleta. **La Mayoría olvida que nuestro Código Civil, en materia de derecho de familia quedó plasmado hace más de un siglo en virtud de un discurso legal plagado de consideraciones morales ya vetustas.** Al comparar el estado actual del derecho que regula el divorcio con el desarrollo de los derechos fundamentales, nos vemos ante una situación jurídica en la que es menester nuestra intervención por mandato constitucional.

La sección 19 del artículo II, de la Constitución del Estado Libre Asociado de Puerto Rico impone una interpretación liberal de los derechos del ser humano contenidos en nuestra Carta de Derechos, a la vez que prohíbe la exclusión de otros derechos pertenecientes al pueblo en una democracia. En varias ocasiones hemos insistido en que al interpretar nuestra Constitución debemos garantizar la continuada vigencia de sus valores

fundamentales frente a las nuevas realidades del país. En ese sentido, nuestro rol es evitar que interpretaciones inflexibles y el apego a viejos modelos impidan que nuestra Constitución sea aplicable a las eventualidades del futuro y en pocos años tornen obsoleta una constitución diseñada para guiar la vida de un pueblo por varios siglos. Por eso, al interpretar los contornos de esa Constitución, debemos garantizar su vigorosidad y relevancia a los problemas de nuestro tiempo. Empresas Puertorriqueñas de Desarrollo, Inc., v. Hermandad Independiente de Empleados Telefónicos, 150 D.P.R. 924, 948-949 (2000); Nogueras v. Hernández Colón, 127 D.P.R. 405, 411 (1990); Pacheco v. Vargas, Alcaide, 120 D.P.R. 404, 410 (1988); P.I.P. v. C.E.E., 120 D.P.R. 580, 613 (1988); López Vives v. Policía de P.R., 118 D.P.R. 219, 227 (1987).

La controversia que hoy nos toca resolver involucra uno de los derechos fundamentales del ser humano dentro de una sociedad liberal y democrática. Hablamos del derecho a que el estado no se inmiscuya en la toma de cierto tipo de decisión perteneciente al ámbito de la intimidad matrimonial y familiar, ya sea imponiendo una carga indebida a quien desee hacer uso de sus derechos, o eliminando los medios adecuados para la realización de la voluntad personal. Nos referimos al derecho que tiene todo ser humano a desarrollarse libremente dentro del entorno familiar y tomar la decisión de disolver un

vínculo o asociación voluntaria como es el matrimonio. En fin, hoy nos toca expresarnos sobre la reconocida libertad de la cual goza toda persona en una sociedad democrática para desarrollarse existencialmente. Para exponer mi opinión, exploraré la visión tradicional de las instituciones familiares como el matrimonio y el divorcio y la evolución del rol de la autonomía de la voluntad en áreas tradicionalmente vinculadas a la intimidad dentro de una sociedad liberal como la nuestra. Al declarar mi disenso, me guía la continua y manifiesta necesidad de calibrar nuestro derecho privado a las transformaciones de la sociedad contemporánea.

Para comenzar, me parece atinado recordarle a esta Curia lo que en Díaz González v. Tribunal Superior, 102 D.P.R. 195, 200-201 (1974) nos pareció propio recalcar:

> [N]o hace daño que cuando el abogado o el juez interpretan o aplican una institución importante del derecho estén conscientes de sus raíces y de su desenvolvimiento a través del tiempo. Si eso es mucho pedir, por lo menos deben estar conscientes de que hay tales raíces y tal desarrollo; que no se trata de meras improvisaciones de ayer que existen por capricho.

En sociedades agrarias, la familia era fundamental para la sobrevivencia misma. El núcleo cercano, unido por estrechos lazos sanguíneos, conformaba la comunidad más próxima con la que podía contar el ser humano en sociedad. El matrimonio era la base de la familia, pues de éste surgían el sustento económico y doméstico y la autoridad que organizaba al pequeño grupo social. Según

nos recuerda Diego Espin Canovas, ya decía Cicerón que el matrimonio era *"principium urbis et quasi seminarium reipublicae"* [4]. El matrimonio era considerado la piedra angular de la sociedad, y de ahí el empeño de los juristas tradicionales en resaltar su carácter institucional. Según Merry Wiesner Hanks[5], "las consecuencias del divorcio podían ser desastrosas", pues al disolverse el matrimonio quedaban delebles la existencia social y la vida.

Para Espín Cánovas al igual que para muchos, el matrimonio es:

> …la institución básica del Derecho de Familia, y por ello se comprende fácilmente que toda la importancia social que se reconoce a la familia… se concentre especialmente en el mismo matrimonio. (…) Estos diversos aspectos del matrimonio, que no cabe separar de su consideración jurídica, han de repercutir necesariamente en el concepto del mismo, desde el punto de vista del Derecho. Espín Canovas, *op cit*, pág. 16.

Puig Brutau[6], cita a Vallet de Goytisolo[7] cuando dijo que el Derecho, "viene dado por circunstancias reales y por datos metajurídicos, especialmente en el derecho de familia". Entre estos datos metajurídicos se encuentra el contenido ético de las llamadas instituciones del

---

[4] Diego Espín Canovas, <u>Manual de derecho civil español</u>, Madrid, Ed. Rev. Der. Priv., Vol. IV, 1984, pág. 16. La frase latina en español significa que el matrimonio es "el fundamento de la ciudad y el semillero del estado."
[5] Merry E. Wiesner-Hanks, <u>Cristianismo y sexualidad en la edad moderna</u>, Madrid, Siglo XXI, 2001.
[6] José Puig Brutau, <u>Fundamentos de Derecho Civil</u>, Barcelona, Bosch, 1985, tomo IV, pág. 2.
[7] Juan Vallet de Goytisolo, <u>Panorama del Derecho Civil</u>, Barcelona, 1963, págs. 240 y ss.

derecho de familia.  Puig Brutau resume este asunto con una cita de Ruggiero[8]:

> En ningún otro campo influyen como en éste la religión, la costumbre, la moral.  Antes que jurídico, la familia es un organismo ético.  De la ética, en efecto, proceden los preceptos más esenciales que la ley presupone y a los cuales hace constante referencia, apropiándoselos a veces y transformándolos de este modo en preceptos jurídicos…

Espín Cánovas expone su visión sobre la regulación social de la institución familiar:

> Sobre estas realidades sociales convergen, de una parte el Derecho, y de otra, la religión, la ética y las costumbres, disciplinando cada uno de estos ordenes normativos, los organismos familiares, desde su punto de vista… Así pues, el fondo predominantemente ético de la familia, como institución social, repercute en su regulación jurídica, y es la primera y más destacada característica del Derecho de Familia. Estas características propias del Derecho de familia le dan una fisonomía publicística… Espín Cánovas, *op cit*, pág. 4.

Como ya mencionamos, la institución del matrimonio se nos presenta en sus orígenes en la civilización occidental como una institución civil organizada en torno a consideraciones mayormente de índole económica[9].  Los conceptos de amor y sexualidad no siempre se concebían como parte de la relación matrimonial, cuyo propósito se reducía más bien a la reproducción y al buen manejo de la economía doméstica.  Con el pasar del tiempo, y con el

---

[8] Ruggiero, Instituciones de Derecho Civil, traducción española, T.II, pág. 659.

[9] Véanse Jenofonte, Económica; Michel Foucault, Historia de la Sexualidad, 11ma ed. (Tomás Segovia, traductor) Madrid, Siglo XXI, 1999, Vol. III, págs. 69-93 y 137-174; Merry E. Wiesner-Hanks, Cristianismo y sexualidad en la edad moderna, Madrid, Siglo XXI, 2001.

refinamiento de las costumbres, se fue desarrollando una dimensión moral, espiritual y conceptual de la pareja dentro del matrimonio, relacionada a la búsqueda de la felicidad.[10] De ahí el rol determinante de la autonomía de la voluntad manifestada mediante el libre consentimiento (y la capacidad para expresar dicho consentimiento) a entrar en la relación matrimonial canalizada mediante el cumplimiento de los requisitos formales impuestos por la legislación[11].

Como nos explica el jurista Vázquez Bote[12], por el rol imperante del consentimiento en la unión matrimonial, la concepción contractualista del matrimonio, fue acogida por las doctrinas del individualismo liberal decimonónico. Como es conocido, dicha vertiente filosófica configuró la ideología subyacente a la codificación.

El artículo 68 de nuestro Código Civil, 31 L.P.R.A. sec. 221, define el matrimonio como "una institución

---

[10] Sobre la evolución del matrimonio en Roma, Foucault, explica que a diferencia de los textos clásicos, en los tratados estoicos de los primeros dos siglos, "el matrimonio ya no se piensa solamente como una 'forma matrimonial' que fija la complementariedad de los papeles en la gerencia de la casa, sino también, y sobre todo, como un 'lazo conyugal' y relación personal entre el hombre y la mujer." M. Foucault, *op cit*, pág. 140. Por su parte Wiesner-Hanks, explica que: "La noción estoica de que los esposos debían sentir "afecto marital" (*affectio maritalis*) uno hacia el otro fue ganando popularidad en los siglos I y II [de la era común]; si ese afecto ya no se sentía, el divorcio formal o una separación menos formal podían poner fin al matrimonio." M. Weisner-Hanks, *op. cit*, pág. 6.
[11] Articulo 69 del Código Civil, 31 L.P.R.A. sec. 231.

civil que procede de un contrato civil en virtud del cual un hombre y una mujer se obligan mutuamente a ser esposo y esposa, y a cumplir el uno para con el otro los deberes que la ley les impone. Será válido solamente cuando se celebre y solemnice con arreglo a las prescripciones de aquélla…". En palabras de Vázquez Bote, el matrimonio es "el acto jurídico que origina la relación familiar… al actuarse origina la comunidad familiar."[13]

Luis Arrechedera[14], se refiere al "consentimiento y a la forma, en un sentido muy amplio como co-principios constitutivos de la relación matrimonial." En cuanto al aspecto formal del lazo conyugal nos aclara Vázquez Bote que:

> El formalismo pudo expresar la proyección de la unión matrimonial como legal; pero, es claro que la legalidad no atribuye permanencia, sino simple adecuación a las exigencias de la norma… [no] debemos pretender que esa permanencia subsista hasta la muerte de ambos cónyuges, pues, entonces estaríamos volviendo la espalda a la realidad de la vida, que fija los conceptos jurídicos. Vázquez Bote, *op cit.*, pág. 22

Por tales consideraciones, el Código Civil introduce la posibilidad de la disolución del vínculo matrimonial en el mismo artículo que incorpora la definición del matrimonio en nuestro régimen civil. Según la letra del citado artículo 68, las limitaciones a la disolución del

---

[13] Vázquez Bote, Derecho Privado Puertorriqueño, Butterworth, 1993, tomo XI, págs. 21-36.
[13] Vázquez Bote, *op cit.*, pág. 21.
[14] Luis Arechederra, Matrimonio y divorcio: Comentarios al nuevo título IV, (José Lacruz Berdejo), Madrid, Civitas, 1982, pág. 79.

vínculo quedan demarcadas por las causales expresamente previstas en el Código Civil.

Detengámonos un momento a considerar el origen de la tendencia occidental de delimitar causas para disolver el vínculo matrimonial. En la cultura occidental de tradición judeocristiana, las causales de divorcio se fueron forjando a la luz de la moral eclesiástica[15]. El vocablo divorcio proviene del latín *divortium*, y aparte de su significado literal, el término aludía al efecto producido por el acto de manifestación de voluntad contra la continuación del matrimonio.[16] La cesación del vínculo de la vida marital ocurría cuando se perdía la capacidad de la *affectio maritalis*:

> Si el matrimonio exige un acuerdo continuo, cuando este acuerdo viene a faltar, necesariamente el hombre y la mujer no pueden ser considerados más como marido y mujer. Esto era tan vivamente sentido por los romanos, que no solo ellos habrían considerado un absurdo el concebir que el matrimonio perdurara, cesado el acuerdo entre los cónyuges, sino que consideraban además como torpe y era vedado por el Derecho para la tutela de la moralidad el obligarse expresamente a no divorciarse o a pagar una pena en caso de divorcio. [17]

Desde que Constantino institucionalizó la religión dentro del Imperio Romano en el Siglo IV, se fue

---

[15] "Constantino y los emperadores posteriores deseaban restringir las posibilidades de divorcio, y la mayoría de las autoridades de la Iglesia siguieron a [San] Agustín", quien desaconsejaba el divorcio. Wiesner Hanks, op cit, pág. 15.
[16] J. Arias Ramos y J.A. Arias Bonet, Derecho Romano, Madrid, 17ª ed., Vol. II, Ed. Rev. Der. Priv., 1984. págs. 734-735.

desarrollando una estrecha relación entre la iglesia y el
Estado.  Las ideas cristianas llegaron a dar forma a las
leyes imperiales y a las prácticas judiciales[18]. Como nos
explica Weisner-Hanks, "[l]a política sexual de la
iglesia y los temas relacionados con ella no era
simplemente un asunto de tratados aprendidos, sino que se
debatía y a veces se decidía en los concilios"[19] y
sínodos, que funcionaban como tribunales, cuyas

> …decisiones, normalmente llamadas *cánones*,
> fueron creando gradualmente un cuerpo de leyes
> de la Iglesia y unas normas en asuntos sexuales…
> [L]a ley de la iglesia (conocida como *Derecho
> canónico*) y la ley secular… estaban
> estrechamente relacionadas en la práctica[20].
> (Énfasis en el original.)

Ya para el siglo XIII, "el Derecho canónico y los
tribunales de la Iglesia controlaban casi todos los
aspectos del matrimonio (excepto en los temas de
propiedades)"[21]. Las causales aceptadas por el Derecho
canónico fueron el adulterio, el abandono, la impotencia
y la esterilidad.  A pesar de la secularización del
Estado, durante la codificación decimonónica se adoptaron
dichas causales, al igual que otras de origen secular,
tal como la causal de divorcio por injurias graves.
Posteriormente se incorporaron las causales de divorcio
por demencia del otro cónyuge y por separación.

---

[18] Pedro Bonafante, Instituciones de Derecho Romano, 3ª
ed., Madrid, Reus, 1965, págs. 189-194.  Véase tambien
Ramos y Bonet, *op. cit.*
[18] Wiesner-Hanks, *op. cit.* pág. 12.
[19] Wiesner- Hanks, *op. cit.* pág. 15.
[20] *Id.*
[21] Wiesner-Hanks, *op cit*, pág. 24.

En nuestra jurisdicción, la causal de separación estableció el divorcio unilateral mediante la separación intencional de las partes por un término fijo de años[22]. El propósito de la separación es brindarle a uno o a ambos cónyuges la oportunidad de disolver un matrimonio que sólo subsiste en la mera formalidad. Cuando se incorporó esta causal, el término original era de siete años, luego, mediante enmiendas, quedó fijado dicho término a dos años. La razón de ser del término es hacer constatar la intención de la separación; dicho periodo de tiempo se supone que establece la presunción de que la ruptura es un hecho consumado.[23] La separación que requiere la causal ha de ser además pública y notoria. Cosme v. Marchand, 121 D.P.R. 225 (1988); Cabrer v. Pietri, 67 D.P.R. (1947). Los requisitos que condicionan la causal de separación nos llegan desde la antigua concepción del matrimonio como asunto público. De acuerdo a dicha concepción, la sociedad tenía licencia para inmiscuirse en espacios que en tiempos actuales hemos convenido reconocer que pertenecen a la esfera privada. Mediante el período de dos años de separación publica y notoria la pareja prueba ante la comunidad que desea divorciarse de su cónyuge. Cabrer v. Pietri, 67 D.P.R. (1947). En fin, el término de dos años que requiere la separación no tiene nada que ver con la

---

[22] Mediante la Ley núm. 46 del 9 de mayo de 1933.
[23] Delmas-Marty y Labrusse-Riou, Matrimonio y divorcio, Bogotá, Temis, 1987, pág. 75.

privacidad que debe imperar en las decisiones personales, sino con el antiguo rol del colectivo comunitario como testigo en los asuntos maritales.[24]

A pesar de que hoy parece amainada una concepción del matrimonio arraigada al valor de dicha institución dentro de la sociedad agraria, la existencia de causales específicas para disolver el vínculo matrimonial denota que el Código responde a una ideología premoderna, ajena a las transformaciones legales que trajo consigo el Constitucionalismo moderno.

Fuera del Código, y desde hace más de tres décadas, la realidad es otra. La protección del vínculo matrimonial se ha volcado hacia los componentes de la unión matrimonial *qua* individuos que libremente han decidido enlazar sus existencias[25]. El reconocimiento de la libertad personal y la autonomía de la voluntad han llevado un renovado concepto occidental de libertad al Derecho de familia, inclusive hasta la recámara. Como explica Joseph Raz[26], en las sociedades occidentales industrializadas ha tenido gran acogida la autonomía personal, que considera la libre determinación de metas y

---

[24] Ello no obstante, un estudio actualizado sobre los requisitos temporales de la causal de separación a la luz del desarrollo de la autonomía de la voluntad puede iluminarnos para resolver razonablemente la controversia que hoy nos ocupa.

[25] Véanse Jana B. Singer, The Privatization of Family Law, 1992 Wis. L.Rev. 1443 y Carl E. Schneider, Moral Discourse and the Transformation of American Family Law, 83 Mich. L. Rev. 1803 (1985).

[26] Joseph Raz, The morality of freedom, New York, Oxford U Press, 1986, págs. 370-399.

relaciones personales como ingrediente esencial del bienestar individual. Para el autor, dicho ideal es particularmente afín con la era post industrial, en términos de sus características (el continuo avance de las tecnologías y el libre flujo laboral) y sus exigencias para con el individuo (como la habilidad para adquirir nuevas destrezas, la habilidad de adaptarse al cambio, la movilidad social entre subculturas, la aceptación de nuevas visiones científicas y morales, etc.) La autonomía se opone a la coacción en la toma de decisiones, o bien, a la ausencia de opciones entre las cuales escoger. Para Raz la autonomía personal no se da en el vacío, es necesario que las personas tengan una gama adecuada de alternativas y que cuenten con un nivel de independencia de criterio tal, que sus decisiones no estén irrazonablemente manipuladas ni dirigidas por ideas preconcebidas y externas.

Debido al enfoque político que usualmente convoca el tema de los derechos humanos, el ámbito de los llamados derechos de la personalidad ha sido tema casi exclusivo del derecho público. Como resalta Puig Brutau[27], la trascendencia de los derechos de la personalidad "puede explicar que su protección se entendiera había de corresponder al Derecho público". Ante esta común situación Luis Diez Picazo y Antonio Gullón señalan que:

---

[27] Puig Brutau, Fundamentos de Derecho Civil, Barcelona, Bosch, 1979, Tomo I, Vol, 1, pág. 60.

La persona no es exclusivamente para el Derecho civil el titular de derechos y obligaciones o el sujeto de relaciones jurídicas. Si esta rama del ordenamiento jurídico se caracteriza básicamente por ser la dedicada a la persona en sí misma considerada, debe ocuparse de la protección de sus atributos físicos y morales, de su libre desarrollo y desenvolvimiento. De ahí que se hable de los derechos de la personalidad, que son según FERRARA, los derechos supremos [de las personas], los que le garantizan el goce de sus bienes personales: el goce de sí mismo, la actuación de sus propias fuerzas físicas o espirituales.[28]

Los textos constitucionales básicos de los Estados proclaman el respeto a la persona, a sus atributos y libertades de un modo amplísimo, reconociendo así una esfera individual que el poder del Estado no puede avasallar. Sin embargo, hoy se ha extendido hacia el campo del derecho privado la preocupación por la defensa de la persona… **En este punto, debe destacarse una falta de atención de los Códigos decimonónicos a esta materia, que fue cubierta en todos los países por una jurisprudencia progresiva.**[29]

---

[28] Diez Picazo y Gullón, <u>Sistema de Derecho Civil</u>, 9na ed., Madrid, Tecnos, 1997, Vol. I, pág. 324.

[29] Diez Picazo y Gullón, <u>Sistema de Derecho Civil</u>, 7ma ed., Madrid, Tecnos, 1989, Vol. I, pág. 351. Énfasis nuestro.

Para un excelente comentario sobre la influencia del constitucionalismo en el Derecho Privado en Puerto Rico véase José Julián Álvarez González, <u>La Reforma del Código Civil de Puerto Rico y los Imperativos Constitucionales: Un comentario</u>, 52 Rev. Col. Abo. P.R. 223 (1991). El Profesor Álvarez González hace un recuento de las opiniones de este Tribunal que, prescindiendo de la acción legislativa, han declarado inválidas varias disposiciones del Código por violentar diversos principios constitucionales. Entre éstas opiniones se encuentran <u>Ocasio v. Díaz</u>, 88 D.P.R. 676 (1963); <u>González v. Tribunal Superior</u>, 97 D.P.R. 804 (1969) y <u>Figueroa Ferrer v. E.L.A.</u>, *supra*. Resulta apropiado mencionar otras opiniones que han atemperado distintas instituciones del Código Civil a las doctrinas constitucionales imperantes o que han reconocido una dimensión más personal en el Derecho de Familia, por ejemplo: <u>Caraballo Ramírez v. Acosta</u>, 104 D.P.R. 474 (1975); <u>Romero Soto v. Morales Laboy</u>, 134 D.P.R. 734 (1993) y <u>Rexach v. Ramírez Vélez</u>, 2004 TSPR 97. En

Dentro de los llamados derechos de la personalidad se encuentra el derecho a la libertad personal. Vázquez Bote define ese derecho como el que permite "determinar nuestras acciones sin coacción externa alguna, ofreciendo [a todas las personas], la posibilidad real de autorealizarse, exigiendo que no se opongan obstáculos inmotivados a nuestra actividad."[30]   Dentro de las libertades personales se encuentran las que Vázquez Bote llama "libertades morales".   Según el autor, éstas consisten en una

> …serie de libertades que deben reconocerse, al individuo, originarias de los correspondientes derechos, y que afectan las esferas más intimas y exclusivas de la persona humana; las cuales, no obstante, tienen trascendencia social... Se trata de esferas de la personalidad a las cuales se entiende que el individuo no renuncia, ni tiene por qué coartarlas, en reciprocidad por la convivencia social. [31]

Vázquez Bote apunta a tres manifestaciones de estas libertades y derechos destacadas por la doctrina: "la libertad y el derecho a determinar el modo de vida"; "la

_____

Puerto Rico urge la reforma de un Código Civil compuesto sesenta y tres años antes que nuestra Constitución, legislado en su mayor parte por mentes extranjeras y reformado fragmentaria e insuficientemente. Véase Trías Monge, Consideraciones sobre la reforma del Código Civil de Puerto Rico, 52 Rev. Jur. U.P.R. 143, 145 (1983). Mientras una reforma cabal no tenga lugar, somos los llamados a revisar sus caducadas disposiciones a la luz de la Constitución. Figueroa Ferrer v. E.L.A., 107 D.P.R. 250 (1978).

[30] Eduardo Vázquez Bote, Derecho Privado Puertorriqueño, New Hampshire, Equity, Tomo III, pág. 473.

[31] *Ibid* págs. 478-482. Ver también J. Santos Briz, Tratado de Derecho Civil, 1era ed. Barcelona, Bosch, 2003, Tomo I, págs. 369-406.

libertad en la esfera íntima o derecho de privatividad" y "la libertad de conciencia y de elección".[32]

Esta particular concepción del derecho a la libertad personal no se encuentra entre los derechos y garantías expresamente expuestos en la Constitución del Estado Libre Asociado de Puerto Rico, a diferencia de otros textos constitucionales. En igual condición se encuentra la Constitución estadounidense. A través de la historia jurisprudencial, tanto norteamericana como puertorriqueña, el derecho a tomar cierto tipo de decisión importante se ha vinculado al derecho a la intimidad y a la dignidad humana.

Según Ferdinand David Schoeman[33], existen varios tipos de normas sociales que le dan forma a lo que entendemos por intimidad. Una de ellas restringe el acceso al espacio donde tradicionalmente se le ha otorgado amplia discreción al individuo para que dirija su comportamiento. Como explica el autor, esta norma permite que exista la vida privada, la individualidad, la asociación con otras personas y la integridad de las varias esferas de la vida. Para Schoeman, dicha norma fomenta la expresión individual, pues el sujeto tiene la libertad para escoger. Al actuar dentro de los lindes discrecionales y tomar una decisión, las personas se colocan en lo que Schoeman llama *expressive role*. Por

---

[32] *Ibid.*
[33] Ferdinand David Schoeman, <u>Privacy and Social Freedom</u>, New York, Cambridge UP, 1992, págs. 13- 23.

ejemplo, una persona puede decidir casarse o separarse de otra, y al hacerlo, su acto contiene la expresión de su voluntad. La protección constitucional a la intimidad cobija también esos actos decisorios, pues a través de los mismos se manifiesta y expresa la historia personal que cada cual va forjando.

Charles Fried[34] opina que aun cuando cada derecho fundamental se reconoce para asegurar otro valor que la convención social haya considerado necesario, la intimidad se distingue de otros derechos al no ser solo una vía para garantizar otros derechos, la intimidad es primordial para las relaciones y los fines del tipo más fundamental como por ejemplo el respeto, el amor, la amistad, la confianza y el afecto. Sin protección a la intimidad, la mera posibilidad de alcanzar dichos fines o sostener dichas relaciones es inconcebible, la existencia misma del amor, el respeto, la amistad y la confianza depende de la intimidad. La intimidad es el contexto donde dichas relaciones se desarrollan, por lo que una amenaza a la intimidad implica una amenaza a nuestra integridad como personas.[35]

---

[34] Charles Fried, *Privacy [a moral analysis]*, Philosophical dimensions of privacy: an anthology, Ferdinand David Schoeman, Ed., New York, Cambridge U Press, 1984, págs. 203-222.

[35] En palabras del autor: "To respect, love, trust and feel affection is at the heart of our notion of ourselves as persons among persons, and privacy is the necessary atmosphere for these attitudes and actions, as oxygen is for combustion." Fried, *op cit*, pág. 205

En otras jurisdicciones se puede ver el creciente reconocimiento de la protección a la autonomía de la voluntad. Luis Javier Mieres Mieres[36] hace un estudio de la autonomía personal según protegida por el derecho a la intimidad y la dignidad personal que reconoce la Constitución española.  Al respecto, nos dice que:

> El respeto que merece toda persona, en tanto ser humano, deriva de su capacidad para elegir, modelar y cambiar su propio plan de vida, de buscar su felicidad a su manera. La creación y control de espacios de reserva es, por un lado, resultado del ejercicio de la autodeterminación individual, pues cada cual decide la medida en la que quiere ser dejado en paz… Respetar esas zonas es respetar la voluntad de quien las ha creado.  Por otro lado, constituyen una condición necesaria para el ejercicio mismo de la "autonomía del individuo para elegir entre las diversas opciones vitales que se le presenten, de acuerdo con sus propios intereses y preferencias." STC 132/1989. Mieres Mieres, *op cit*, pág. 27.

Mieres Mieres nos refiere también a la Sentencia del Tribunal Constitucional de España 151/1997 según la cual las sentencias judiciales que sancionan actos que han sido reconocidos como parte del derecho a la intimidad implican una "acción" "cuyo objetivo es la modificación de una pauta de conducta desarrollada en el ámbito de la vida privada."  Concluye entonces el Tribunal Constitucional que:

> Someter a sanción determinados comporta-mientos o decisiones estrictamente personales supone una restricción del libre desarrollo de la personalidad y del núcleo decisional del derecho a la intimidad.  Mieres Mieres, *op cit*, pág. 29-30.

---

[36] Luis Javier Mieres Mieres, <u>Intimidad personal y familiar</u>, Navarra, Aranzadi, 2002, pág. 27

La jurisprudencia estadounidense es perfecto ejemplo de la tendencia que hoy nos parece de obligada aplicación al caso de autos. La trayectoria del reconocimiento de la autonomía decisional como parte de la libertad protegida por el debido proceso de ley y el derecho a la intimidad presentan una evolución ascendente hacia el reconocimiento abarcador de dichas protecciones. Como punto de partida, tenemos la opinión disidente del Juez Brandeis en Olmstead v. United States, 277 U.S. 438, 478 (1928) que se ha convertido en epítome del derecho a la intimidad según concebido por la doctrina anglosajona. En la misma, el Juez Brandeis explica cómo los autores de la Constitución estadounidense se ocuparon de asegurar unas condiciones constitucionales que fueran cónsonas a la búsqueda de la felicidad. Al reconocer el significado de la espiritualidad, de los sentimientos y del intelecto humano, los creadores de la Constitución buscaron proteger las creencias, pensamientos, emociones y sensaciones del ser humano. Por ello, les fue concedido a las personas el derecho a que el gobierno las deje quietas (the right to be left alone), el cual, según el Juez Brandeis, es el más abarcador de los derechos, y el más valorado por las gentes civilizadas.[37]

_____

[37] El fragmento antes traducido de la opinión disidente lee como sigue:

> **The makers of our Constitution** undertook to secure conditions favorable to the pursuit of happiness. They **recognized the significance of man's spiritual nature, of his feelings and of his**

La muy citada opinión mayoritaria de <u>Griswold v. Connecticut</u>, 381 U.S. 479 (1965) explica que la Cuarta y la Quinta Enmienda de la Constitución de Estados Unidos representan protecciones contra todo tipo de intrusión gubernamental, tanto en el santuario del hogar, como en los aspectos considerados como privados en la vida. En esa opinión mayoritaria se reconoció que las decisiones tomadas durante la relación matrimonial se encuentran dentro de la zona de intimidad protegida por la Constitución. Posteriormente, en <u>Loving v. Virginia</u>, 388 U.S. 1,7 (1967), el Tribunal Supremo expresó que los poderes estatales de reglamentación matrimonial están sujetos a las protecciones que brinda el derecho al debido proceso de ley sustantivo a los intereses libertarios incluidos en la Decimocuarta Enmienda de la constitución estadounidense.

En <u>Roe v. Wade</u>, 410 U.S. 113 (1973) el tribunal de mayor jerarquía en Estados Unidos se adhirió nuevamente al principio de que existe un derecho de privacidad personal implícito en la Primera, Cuarta, Quinta, Novena y Decimocuarta Enmiendas y en las penumbras de la Carta de Derechos, bastante amplio como para cubrir cierto tipo

---

**intellect.** They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. **They conferred, as against the government, the right to be left alone—the most comprehensive of rights and the right most valued by civilized men.**

de decisión íntima. En Cleveland Board of Education v. LaFleur, 414 U.S. 632 (1974), el Tribunal Supremo estadounidense insistió en admitir que la libertad personal de tomar decisiones (*freedom of personal choice*) relacionadas a asuntos maritales y familiares es una de las libertades resguardadas por la Decimocuarta enmienda del referido texto constitucional. Añadió que el Estado estaba impedido, tanto a imponer una carga indebida (*undue burden*) como a obstaculizar arbitraria o caprichosamente el ejercicio de dichas libertades. La doctrina antes expuesta fue reiterada en Zablocki v. Redhail, 434 U.S. 374 (1978), donde además se añadió que el estado tampoco puede disminuir, de manera injustificada, la libertad a tomar decisiones personales en torno a asuntos matrimoniales y familiares[38].

Un año antes, la jurisprudencia estadounidense había reconocido dos clases de intereses relacionados a la intimidad que deben ser protegidos constitucionalmente. En Whalen v. Roe, 429 U.S. 589, 598-99 (1977) se estableció dicha bifurcación entre, por un lado, el interés individual en evitar la divulgación de asuntos

---

Véase también Samuel D. Warren y Louis D, Brandeis, The Right of Privacy, 4 Harvard Law Review 194 (1890).
[38] Véanse además Carey v. Population Services International, 431 U.S. 678, (1977; Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 541-542, (1942); Eisenstadt v. Baird, 405 U.S. 438, 453-454 (Concurrente del Juez White), Prince v. Massachusetts, 321 U.S. 158, 166 (1944); Pierce v. Society of Sisters, 268 U.S. 510, 535, (1925); Meyer v. Nebraska, 262 U.S. 390, 399 (1923) Roe v. Wade, 410 U.S. 113, 152-153, (1973); Smith v.

personales, y por el otro, el interés individual cimentado sobre la autonomía personal para tomar cierto tipo de decisión importante. El tribunal estableció que hay limitaciones en el poder regulador del Estado cuando están involucradas estas decisiones. Schoeman explica que esta concepción de la intimidad, la que comprende aspectos de la autonomía de la voluntad sin limitarse a la intimidad física o de la información, es de las más abarcadoras. El autor expone que según esta concepción, la intimidad es la medida del espacio social y legal que debe concedérsele a un individuo para que desarrolle los poderes emocionales, cognoscitivos y espirituales propios de un ente autónomo[39].

En Moore v. City of East Cleveland, 431 U.S. 494 (1977), el Tribunal Supremo declaró haber consistentemente reconocido una esfera privada de la vida familiar en la que el estado no puede inmiscuirse sin exponer los intereses gubernamentales de su intrusión. Dicho caso explicó que el alcance de la protección constitucional y libertaria en cuanto a las decisiones familiares que brinda la Decimocuarta enmienda no puede reducirse a una fórmula particular, sino que queda sujeta a un juicio valorativo entre la libertad individual y las necesidades de la vida en sociedad. Según el Tribunal Supremo, la libertad encarnada en el debido proceso de

_____

Organization of Foster Families, 431 U.S. 816, 842-844, (1977); Paul v. Davis, 424 U.S. 693, 713 (1976)
[39] Schoeman, *op. cit.* pág 13.

ley sustantivo es un continuo racional que traza sus linderos en los valores intrínsecos de la cultura occidental, y se extiende para proteger los modos de realización individual que subyacen en los diversos estamentos de una sociedad libre.

Finalmente, el caso normativo de <u>Planned Parenthood v. Casey</u>, 505 U.S. 833, 112 S. Ct. 2791 (1992), introdujo una nueva vertiente de corte subjetivista en la línea de casos sobre la libertad personal y la autonomía individual. Allí quedó instituido el principio de que existe tal cosa como una promesa constitucional de establecer un ámbito de libertad personal en la que el estado no ha de intervenir. El caso amplía el concepto libertario del debido proceso de ley sustantivo y establece que los asuntos que involucran decisiones de carácter intimo y personal constituyen el eje de la dignidad y la autonomía personal, conceptos que a su vez son constitutivos de la libertad protegida por la Enmienda Decimocuarta. La opinión expresa que en la médula de la libertad radica el derecho de las personas a definir conceptos individuales de índole existencial y resolver cuestionamientos característicos de la condición humana. No sería posible forjar la personalidad propia si la definición de dichos conceptos y cuestionamientos está sujeta al imperio del Estado[40].

---

[40] La doctrina que antes traducimos lee en su texto original como sigue:

These matters, involving the most intimate and personal choices a person may make in a lifetime,

Las doctrinas antes expuestas fueron reproducidas en Lawrence v. Texas, 539 U.S. 558 (2003), donde además se explicó que la libertad se extiende mas allá de limites espaciales.  Según el Tribunal, la libertad comprendida en la garantía al debido proceso de ley sustantivo presume una autonomía personal del ser que incluye la libertad de pensamiento, creencias, expresión y la libertad para llevar a cabo cierta conducta íntima.  Con dichas decisiones, la libertad reconocida por el debido proceso de ley se divorcia de la anterior concepción tradicionalista que situaba la protección libertaria en cerrada relación diádica con ciertos valores tradicionalmente reconocidos en la sociedad democrática. Los lindes de la libertad quedaban sujetos a una presunta convención social mediante la cual "la sociedad democrática" delineaba ciertos valores considerados propios de la democracia.

A través de la jurisprudencia estadounidense, el matrimonio se ha ido alejando de la antigua visión correspondiente a las sociedades agrarias  Dicha visión ha cedido a favor de una perspectiva más a tono con el

---

These matters, involving the most intimate and personal choices a person may make in a lifetim choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment.  At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life.  Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the state. Planned Parenthood v. Casey, *supra*, pág. 851.

amor, el afecto, los sentimientos involucrados en la decisión de asociarse con otro ser humano y la libertad necesaria para tomar una decisión tan íntima. En Griswold, *supra*, pág. 486, el Tribunal Supremo de los Estados Unidos describió al matrimonio como una asociación que promueve un estilo de vida, una asociación con un propósito tan noble como otras asociaciones. Años después, en Roberts v. U.S. Jaycees, 468 U.S. 609 (1984), el Tribunal Supremo estadounidense reconoció haber interpretado la protección constitucional al derecho a la asociación en dos sentidos. De un lado se encuentra la conocida protección que la Primera Enmienda brinda al derecho de asociación como parte del derecho a la libre expresión; del otro, la protección a la decisión de las personas a entrar en ciertas relaciones íntimas, sin la intrusión indebida del Estado. El Tribunal explicó que el rol de la protección a este tipo de asociación íntima es cardinal para el aseguramiento de la libertad individual que constituye la esencia de nuestro esquema constitucional.

En Roberts, el Tribunal Supremo de los Estados Unidos señaló, como lo ha hecho desde principios del siglo XX, que el propósito de la Carta de Derechos es asegurar la libertad individual. Por eso, reiteró su deber de proporcionar una medida sustancial para amparar la formación y conservación de cierto tipo de relación personal frente a interferencias estatales

injustificadas. De acuerdo a dicho principio, el Tribunal reconoció que existe cierto tipo de lazo interpersonal que ocupa un lugar determinante en la cultura y en las tradiciones occidentales. Dichas relaciones, según lo articuló el Tribunal, fomentan la diversidad al promover el desarrollo y el intercambio de ideales y creencias, además del enriquecimiento emocional del que gozan los individuos al entablar lazos íntimos con otros.[41]    Al proteger estas relaciones interpersonales de interferencias estatales injustificadas, se garantiza la posibilidad de definir la propia identidad.    Por eso, por lo que las salvaguardas constitucionales que merecen dichas relaciones resguardan los valores que constituyen el meollo mismo de la libertad en todas las posibles extensiones de ese concepto.

Para el Tribunal Supremo estadounidense las relaciones familiares son el más claro ejemplo de las

---

[41] Para llegar a dicha conclusión, el Tribunal Supremo utilizó a Meyer v. Nebraska, 262 U.S. 390, 399 (1923); Pierce v. Society of Sisters, 268 U.S. 510, 534-535 (1925); Olmstead v. United States, 277 U.S. 438, 478 (1928) (Disidente de Brandeis); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460-462 (1958); Poe v. Ullman, 367 U.S. 497 (1961) (Disidente de Harlan); Griswold v. Connecticut, 381 U.S. 479, 482-485 (1965); Stanley v. Georgia, 394 U.S. 557, 564 (1969); Wisconsin v. Yoder, 406 U.S. 205, 232 (1972); Wisconsin v. Yoder, 406 U.S. 205, 232 (1972); Stanley v. Illinois, 405 U.S. 645, 651-652 (1972); Gilmore v. City of Montgomery, 417 U.S. 556, 575 (1974); Cleveland Board of Education v. LaFleur, 414 U.S. 632, 639-640 (1974); Moore v. East Cleveland, 431 U.S. 494, 503-504 (1977); Carey v. Population Services International, 431 U.S. 678, 684-686 (1977); Smith v. Organization of Foster Families, 431 U.S. 816, 844 (1977); Zablocki v. Redhail, 434 U.S. 374, 383-386 (1978); Quilloin v. Walcott, 434 U.S. 246, 255 (1978).

asociaciones interpersonales que merecen el más riguroso

amparo constitucional, pues por su naturaleza, implican

un profundo apego y compromiso. Además, las relaciones

familiares presentan un contexto especial, poco

comparable con otro tipo de asociación, en el que se

comparten ideas, experiencias y pensamientos. Se trata,

pues, de relaciones intrínsecamente relacionadas a la

libertad. En palabras del Tribunal Supremo de Estados

Unidos:

> The personal affiliations that exemplify
> these considerations, and that therefore suggest
> some relevant limitations on the relationships
> that might be entitled to this sort of
> constitutional protection, are those that attend
> the creation and sustenance of a family-
> marriage, childbirth, the raising and education
> of children, and cohabitation with one's
> relatives. Family relationships, by their
> nature, involve deep attachments and commitments
> to the necessarily few other individuals with
> whom one shares not only a special community of
> thoughts, experiences, and beliefs but also
> distinctively personal aspects of one's life.
> Among other things, therefore, they are
> distinguished by such attributes as relative
> smallness, a high degree of selectivity in
> decisions to begin and maintain the affiliation,
> and seclusion from others in critical aspects of
> the relationship. As a general matter, only
> relationships with these sorts of qualities are
> likely to reflect the considerations that have
> led to an understanding of freedom of
> association as an intrinsic element of personal
> liberty.[42]

En M.L.B. v. S.L.J., 519 U.S. 102, (1996) el

Tribunal declaró que las decisiones sobre el matrimonio,

la vida familiar y la crianza de los hijos se encuentran

entre los derechos de asociación que el estado no puede

---

[42] Roberts v. U.S. Jaycees, *supra*, págs. 619-620

usurpar, ignorar o violentar.  Ver también Overton v. Bazzetta, 539 U.S. 126 (2003).

En Puerto Rico, a diferencia de Estados Unidos, el derecho a la intimidad consta expreso en nuestra Constitución.  El artículo II, sección 8 de nuestra Carta de Derechos reconoce que "[t]oda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar." Hace casi tres décadas, en Figueroa Ferrer v. Estado Libre Asociado, 107 D.P.R. 250 (1978) tuvimos la oportunidad de expresarnos en torno al derecho a la autonomía de la voluntad y los derechos de la personalidad, según protegidos por el derecho a la intimidad y su relación con la institución matrimonial y su disolución. Comenzamos nuestra opinión reconociendo el ancho campo que abarca el derecho a la intimidad en nuestra sociedad. Al respecto citamos nuestra jurisprudencia que establece que:

> En la sociedad democrática organizada alrededor de los derechos fundamentales del hombre, el Estado ha de reducir a un mínimo su intervención con sensitivas urdidumbres emocionales como lo son las relaciones de familia.  La intromisión en la vida privada solo ha de tolerarse cuando así lo requieran factores superantes de salud y seguridad públicas o el derecho a la vida y la seguridad de ser humano. Figueroa Ferrer, *supra*, pág. 259.

En dicha opinión adoptamos la jurisprudencia estadounidense hasta aquel momento resuelta que reconoce la protección constitucional a la libertad de tomar decisiones sobre asuntos familiares.  Además reconocimos

que el campo de los derechos humanos con aspiración de universalidad ha evolucionado al punto de incluir ciertos aspectos de las relaciones familiares. En Pueblo v. Duarte Mendoza, 109 D.P.R. 596 (1980), aclaramos que las protecciones constitucionales que tienen su base en el concepto de libertad personal protegido por las cláusulas del debido proceso de ley de las enmiendas Quinta y Decimocuarta de la Constitución federal le son extensibles a Puerto Rico. Por lo que el derecho a la intimidad en nuestra jurisdicción, al igual que en la estadounidense, se lesiona cuando se limita la facultad de un individuo de tomar decisiones personales, familiares o íntimas.

En Segarra Hernández v. Royal Bank de P.R. 145 D.P.R. 178 (1999), nos hicimos eco de las expresiones de Trías Monge en cuanto a que la protección a los derechos de autonomía personal imponen al Estado una función dual: abstenerse de actuar en una forma que viole el ámbito de autonomía e intimidad individual y actuar de forma positiva en beneficio del individuo. J. Trías Monge, Historia Constitucional de Puerto Rico, Río Piedras, Ed. U.P.R., 1982, Vol. II, pág. 200. Es decir, el Estado tiene, tanto el deber de no inmiscuirse irrazonablemente en la toma de decisiones sobre asuntos familiares y personales, como el deber de proveer mecanismos para que las personas puedan desarrollar sus respectivas personalidades en diversos ámbitos

pertenecientes a las zonas íntimas de la vida humana en sociedad.

El derecho de autonomía en la toma de decisiones sobre la vida íntima o familiar sin que medie la intervención indebida del Estado o de personas particulares, no puede estar supeditado a factores externos que impidan sustancialmente su libre ejercicio. Arce v. Martínez, 146 D.P.R. 215 (1998). En nuestra jurisdicción, cualquier interferencia con alguna de estas decisiones protegidas por el derecho fundamental a la intimidad estará sujeta al escrutinio estricto y sólo podrá sostenerse si el estatuto pretende específicamente adelantar un interés estatal apremiante. López Rivera v. Estado Libre Asociado de Puerto Rico, 2005 TSPR 102. Cuando el Estado intervenga en estos ámbitos protegidos tendrá que demostrar que existe un interés apremiante que justifique la intromisión o limitación, y que dicha limitación es necesaria para alcanzar dicho interés.

La libertad de tomar la decisión de asociarse íntimamente y el derecho a establecer vínculos íntimos implica la libertad para desligarse de dichos lazos voluntarios. En Figueroa Ferrer v. ELA, *supra*, hicimos alusión a diversos autores como Mc Dougal y Laswell[43], que condenaban las limitaciones irrazonables a la libertad para terminar relaciones personales disfuncionales. Para

---

[43] Mc Dougal, Laswell y Lung-Chu-Chen, Human Rights and World Public Order: Human Rights in Comprehensive Context, 72 Nw. U.L. Rev. 227, 235, 255 (1977).

los autores, dicha libertad forma parte del derecho de todo ser humano a participar en los procesos afectivos. Concluimos que, en ausencia de intereses públicos apremiantes, el estado no puede violar la zona de intimidad protegida por la sección 8 artículo II, más aún, dijimos que es alta responsabilidad del Estado velar por la adecuada protección de las partes que disuelven su vínculo matrimonial. Declaramos en dicha ocasión que el Estado está impedido de obligar a dos seres humanos a permanecer atados cuando el vínculo está indudablemente deshecho.

Por los asuntos de gran interés público que rodean el lazo conyugal, particularmente cuando hay propiedades y menores involucrados, el Estado ha monopolizado el medio para disolver el matrimonio. El artículo 95 del Código Civil, 31 L.P.R.A. sec. 301, prescribe que el vínculo del matrimonio se disuelve en los siguientes casos:

> (1) Por la muerte del marido o de la mujer.
> (2) Por el divorcio legalmente obtenido.
> (3) Si el matrimonio se declarase nulo.

Por su parte, el artículo 97, 31 L.P.R.A. sec. 331, establece el único procedimiento para obtener un divorcio. Según dicho precepto, "[e]l divorcio sólo puede ser concedido mediante juicio en la forma ordinaria y por sentencia dictada por el Tribunal Superior." No existe circunstancia dentro de la cual un matrimonio válidamente celebrado pueda disolverse en vida de los cónyuges si no

es mediando el aparato judicial. Ahora bien, según resolvió el Tribunal Supremo de Estados Unidos en Boddie v. Connecticut, 401 U.S. 371 (1971) hay intereses libertarios involucrados en la disolución del vínculo matrimonial. Por eso, para limitar el acceso a los Tribunales para obtener una sentencia de divorcio, el estado debe demostrar intereses que contrarresten suficientemente dichos intereses libertarios.

En el caso de United States v. Kras, 409 U.S. 434 (1973) el Tribunal Supremo de Estados Unidos explicó que negar el acceso al foro judicial, como ocurrió en Boddie, supra, perturba directamente la relación matrimonial, y trastoca los derechos de asociación que circundan el establecimiento y disolución del matrimonio. El Tribunal aprovechó la ocasión para recalcar la importancia fundamental de los intereses de asociación bajo la Constitución de Estados Unidos y resaltó que el impedimento a terminar un matrimonio impide a los cónyuges entrar en nuevas relaciones consensuales de índole íntima.

Así mismo, el artículo 70-a de nuestro Código Civil 31 L.P.R.A. sec. 232a establece que hombre y mujer no quedan en aptitud de formalizar nuevo matrimonio hasta luego de la disolución del matrimonio anterior. No es hasta tanto se disuelve el matrimonio que las personas pueden asociarse íntimamente con otras. Además, la conducta adultera y bígama está tipificada como un

delito, por lo que la limitación al divorcio conlleva un impedimento a involucrarse en cierto tipo de actividades de asociación íntima.[44]

Como dijéramos en Figueroa Ferrer v. ELA, *supra*, la institución del divorcio ha sufrido notables cambios a través de los tiempos. En dicha ocasión, adecuamos el Derecho privado a la realidad imperante y aplicamos, tanto las doctrinas constitucionales vigentes como los derechos humanos reconocidos internacionalmente sobre el derecho a la intimidad y a la dignidad humana en temas familiares. En aquel momento encontramos que la normativa sobre el divorcio y las causales aceptadas en nuestra jurisdicción creaban dos tipos de lesión al derecho a la intimidad. Por un lado el caso de Figueroa Ferrer, *supra*, involucraba la lesión al derecho de la autonomía de la voluntad de los cónyuges al verse limitado su derecho a disolver el lazo matrimonial mediante unas causales con las que no podían cumplir sin ocasionar fraude al tribunal. Por otro lado, en dicho caso estaba involucrada otra lesión al derecho a la intimidad y dignidad de los cónyuges al verse obligados a divulgar información

---

[44] Nuestro Código Penal considera la siguiente conducta como constitutiva de delito contra el estado civil:
  a. Artículo 126. Bigamia. Toda persona que contrae un nuevo matrimonio son haberse anulado o disuelto el anterior o declarado ausente el cónyuge conforme dispone la ley incurrirá en delito menos grave. 33 L.P.R.A. sec. 4754.
  b. Artículo 130. Adulterio. Toda persona casada que tenga relaciones sexuales con una persona que no sea su cónyuge incurrirá en delito menos grave. 33 L.P.R.A. sec. 4758.

personal sobre sus vidas intimas para establecer cualquier causal de divorcio.

Al atender las controversias planteadas nos vimos en la obligación de ampliar los modos para disolver un matrimonio, más allá de las causales basadas en conceptos de culpa. De modo que reconocimos la intromisión indebida e injustificada del Estado al imponer normas imperativas[45] según las cuales la disolución de la asociación matrimonial quedaba circunscrita a ciertas causales específicas. Para subsanar la lesión a la autonomía de la voluntad de los cónyuges que comparecieron ante nos en Figueroa Ferrer, *supra*, nos vimos en la necesidad de declarar inconstitucional la parte del artículo 97 de nuestro Código Civil que prohibía la colusión entre los cónyuges para obtener el divorcio. Por los hechos que dieron pie a la controversia, el consentimiento mutuo fue la causal que se aplicó a quienes ya estaban de acuerdo a divorciarse. No tuvimos la ocasión de expresarnos sobre otras posibles

---

[45] Como explicó el Juez Negrón García en su Opinión concurrente de In re López Olmedo, 125 D.P.R. 265 (1990):

> Son normas imperativas, o de 'ius cogens', aquellas cuyo mandato es de inexcusable cumplimiento, debiéndose ajustar la conducta de la persona, su comportamiento, a lo establecido por la norma para que sus actos tengan validez y eficacia jurídica… Mientras que las normas facultativas o dispositivas conceden a la autonomía de la voluntad privada un margen de facultades distinto del preceptuado en las propias normas, en las imperativas y prohibitivas ese margen de autonomía queda eliminado, teniéndose que acomodar la actuación de las personas a lo preceptuado concretamente en el mandato normativo.

maneras de encausar el derecho de los cónyuges a realizar su voluntad íntima.

No podemos ahora hacer de nuestra opinión en Figueroa Ferrer v. ELA, *supra*, una camisa de fuerza para limitar los derechos que precisamente quisimos reconocer hace casi tres décadas. El caso de autos versa sobre la primera lesión que atendimos en Figueroa Ferrer, *supra*, a saber, la lesión al derecho de autonomía de la voluntad para decidir disolver el vínculo matrimonial. No debemos obviar que el carácter compulsorio de la ley canaliza la expresión que el individuo manifiesta al tomar una decisión[46]. El derecho humano a la búsqueda de la felicidad a través del afecto y la asociación íntima impone una protección de la autonomía de la voluntad individual que deja en claro descrédito el obstáculo injustificado que es la imposición taxativa de causales de divorcio. A fin de cuentas, el divorcio no es sino la manifestación jurídico-procesal del fracaso de una unión matrimonial. Por tal razón, y a tono con la doctrina antes expuesta, resolvería que el Estado no puede imponer unas causales de divorcio cuyo origen y propósito no tienen nada que ver con la concepción abarcadora de la libertad individual del ser humano que hoy en día se reconoce en otras jurisdicciones bajo el debido proceso de ley sustantivo y la protección a la intimidad.

---

[46] Schoeman, *op. cit.*, pág. 25.

Hace una década Serrano Geyls[47] dijo lo siguiente:

> No sabemos lo que resolvería el T.S. [Tribunal Supremo] si uno de los esposos reclamara su derecho a divorciarse sin tener que esperar el periodo de dos años de la causa de separación y sin tener que revelar sus intimidades. Sería muy extraño, considerando el fundamental derecho a la intimidad en que se asienta el caso *Figueroa*, que el T.S. [Tribunal Supremo] se negara a darle rango constitucional al divorcio fundado en la ruptura irreparable del matrimonio.

Sin duda nos encontramos ante un "extraño" evento jurídico. La Opinión mayoritaria no representa sino un escollo para quienes recurren ante la Rama Judicial a vindicar sus derechos personales confiados en la presunta sensatez de la discreción judicial y en los principios básicos de independencia judicial. Trias Monge[48], al alertarnos sobre los factores que minan la independencia judicial, señaló "nuestra inclinación ocasional a la búsqueda de la explicación superficial y fácil de las dificultades que confrontamos, al uso de peligrosos mecanismos de reacción". La Opinión de la cual enérgicamente disentimos presenta uno de esos mecanismos de reacción de los cuales nos alertaba Trías Monge.

Es el sentir de ciertos comentaristas que la llamada "revolución divorcista" de los años setenta es la causa de la disgregación familiar y de los consecuentes males sociales que acarrea la decadencia de tan fundamental

---

[47] En <u>El derecho de familia de Puerto Rico</u>, San Juan, Programa de educación Jurídica Continua UIPR, 1997, pág. 532.

[48] En <u>El sistema judicial de Puerto Rico</u>, 2da ed., Editorial Universidad de Puerto Rico, 1988, pág. 171.

institución.[49] Así por ejemplo, hay comentaristas que arguyen que por ser la familia matrimonial la idónea para el desarrollo de ciudadanos estables y moralmente íntegros el Estado debe limitar las causas para la disolución matrimonial, haciendo caso omiso de la poca idoneidad de un matrimonio que ha perdido su fundamento afectivo y mutuo compromiso.

Hoy la Mayoría del Tribunal parece unirse a estos comentaristas al decidir que el Estado tiene un interés apremiante en mantener la unión matrimonial. Como fundamento para tal declaración nos refiere al caso de Almodóvar v. Méndez Román, 125 D.P.R. 218 (1990) donde, **en el contexto de una acción de impugnación de filiación y en defensa del concepto de legitimidad de los hijos nacidos dentro del matrimonio**, establecimos que la protección de la **institución del matrimonio** (no de **la unión matrimonial**) constituye un interés apremiante del Estado. Dicho interés apremiante se articuló en consideración a la presunción de legitimidad de los hijos nacidos dentro del matrimonio. Explicamos que "el matrimonio confiere certeza en la paternidad", por lo que es "más fácil la reclamación de una filiación matrimonial

---

[49] Véanse por ejemplo, Peter Nash Swisher, Reassessing fault factors in no-fault divorce, 31 Family L. Q., Núm. 2, Verano 1997, pág. 269; Marriage in America: A Report to the Nation , Council on Families in America, Institute for American Values, New York, 1995; Lynn D. Wardle, Divorce Reform at the Turn of the Millenium: Certainties and Possibilities, 33 Family L. Q., Núm. 2, Verano 1997, pág. 783.

y más difícil su impugnación''. El interés en la protección de la institución matrimonial que formulamos en Almodóvar v. Méndez Román, *supra*, formó parte de una defensa a la naturaleza de las acciones filiatorias y de impugnación de paternidad y sus términos prescriptivos, no a un interés en mantener una relación matrimonial que ya ha perdido la motivación para cumplir con sus recíprocas obligaciones.

En su somero análisis, la Mayoría ha extrapolado conceptos. Ciertamente hemos reconocido antes que el matrimonio es una institución civil claramente protegida y establecida en nuestro orden social y jurídico, por lo cual ocupa un lugar predominante y fundamental en la sociedad puertorriqueña. In re Hon. González Porrata-Doria, 158 D.P.R. 150, 157-158 (2002); véanse además Pérez, Román v. Proc. Esp. Rel. Fam., 148 D.P.R. 201 (1999) y Sostre Lacot v. Echlin of P.R., Inc., 126 D.P.R. 781 (1990). Pero la Opinión mayoritaria confunde lo que envuelve proteger jurídicamente la existencia de una institución y el fomento de la política pública que promueve un modelo familiar matrimonial[50], con la imposición de dicha política publica a toda costa. Ni los materiales etnográficos ni los historiográficos permiten

---

[50] Almodóvar v. Méndez Román, *supra,* pág. 236.

hoy proponer la universalidad de la familia nuclear.[51] La diferencia en el modo en que son realizadas las funciones sexuales, reproductivas y económicas promueve una configuración cambiante del grupo familiar:

> Con el desarrollo del estado primero y con la revolución industrial después, los grupos de parientes, y en particular la familia, han perdido funciones políticas y productivas. El movimiento feminista modificó el reparto de papeles procreativos y las nuevas tecnologías reproductivas lo están modificando aun más. Pero no debemos pensar en un modelo uniforme de familia, propio de todas la sociedades o al que todas tenderían, ni en términos de la "vieja" familia nuclear ni de la "nueva" familia de doble carrera, con trabajo de la mujer fuera del hogar, con un número de hijos que no llega a alcanzar la tasa de reproducción divorcio frecuente y núcleos monoparentales. El mundo es muy diverso, y se está generando constantemente diversidad cultural.[52]

Proveer cauces procesales compatibles con el desarrollo de la autonomía de la voluntad en materia de divorcio no debilita ni desarticula las instituciones del matrimonio y de la familia. Todo lo contrario, al facilitar los procesos para que las parejas encaucen judicialmente sus desavenencias y pongan fin a relaciones voluntarias que por múltiples razones se han tornado insalvables, se promueve la solución pacífica y el dialogo saludable dentro de una familia que pasa por momentos difíciles. Decir que el Estado tiene un interés apremiante en mantener casadas a las personas, aún en contra de la voluntad de uno de los cónyuges no denota

---

[51] *Diccionario Temático de antropología*, 2da Ed., Barcelona, Editorial Boixareu Universitaria, 1993, pág. 323.
[52] *Ibid.* pág. 325.

otra cosa que una lectura superficial de nuestra jurisprudencia y un decepcionante retroceso jurídico, producto de un análisis apresurado y enajenado de la realidad social.[53] No podemos aspirar a mejor meta que gozar de un Derecho de Familia maduro que promueva la tranquilidad y estabilidad que brinda la sinceridad en las relaciones personales.

Hoy estamos lejos de aquella extrema vulnerabilidad a la que se exponían las personas luego de un divorcio. Las familias cuentan con las debidas protecciones procesales y sustantivas que mediante legislación y vastísima jurisprudencia el Estado se ha ocupado de estructurar. Por eso, los verdaderos intereses apremiantes del Estado en procesos de divorcio son aquellos relacionados a sus poderes de *parens patriae* y a la obligación de garantizar el derecho a la vida y la dignidad humana. El Estado está obligado a intervenir en todo aquello que implique el bienestar de los menores, por ejemplo la fijación de los alimentos, la patria potestad y la custodia. Los alimentos entre ex cónyuges, y la división de los bienes del matrimonio también son cuestiones que el Tribunal tiene que dirimir y cuya guarda corresponde a un interés apremiante del Estado.

La Mayoría declara que acceder a los reclamos de la apelante implica reconocer un divorcio unilateral que

---

[53] Para un buen ejemplo de la situación que debemos evitar, véase <u>Dimas v. Ortiz</u>, 8 D.P.R. 418 (1905).

violentaría el debido proceso de ley (en su vertiente procesal) del otro cónyuge al no darle una oportunidad para ser oído durante el proceso de divorcio. Al hacerlo, tal parece que la Mayoría hace abstracción de la realidad. Un proceso de divorcio como el que solicita la apelante le brinda la oportunidad al cónyuge demandado a comparecer y a ser oído. Ahora bien, el demandado puede expresar su objeción a un decreto de divorcio. Pero, ¿de qué manera puede el Tribunal adjudicar un pleito en el que una parte declare que desea divorciase y otra que no? La sana discreción del Tribunal debe limitarse en tales casos a cerciorarse de que las partes comprenden las consecuencias legales del divorcio; asegurarse de que ninguna de las partes opera bajo coacción o alguna de las causas que anulan los actos jurídicos y que ambas partes poseen plena capacidad para actuar.

Por último, debo resaltar que la Opinión Mayoritaria no explica cuál es el hecho principal que trajo esta controversia ante nuestra consideración. La peticionaria no se puede poner de acuerdo con su cónyuge para articular las estipulaciones requeridas en el procedimiento de divorcio por mutuo consenso. Por esta razón, solicita que se reconozca un modo contencioso de encausar su decisión de terminar el matrimonio sin que tenga que recurrir a las causales culposas que establece el Código Civil. La Opinión que la mayoría del tribunal suscribe tampoco demuestra cuáles son los intereses

apremiantes del Estado para no concederle a la peticionaria el derecho que solicita, limitando así indebidamente su capacidad para tomar decisiones familiares y de asociación protegidas constitucionalmente.

Los derechos que están en juego son fundamentales y esenciales para el pleno desarrollo de la peticionaria, quien desea terminar con una relación a la que entró voluntariamente. La situación en la que se ha colocado a la peticionaria la obliga a recurrir a los mecanismos que condenamos en Figueroa Ferrer, *supra*, o a mantenerse cautiva en una relación que estanca su evolución personal e intima. Como hemos explicado, en Figueroa Ferrer*, supra*, no abundamos sobre la causal de ruptura irreparable, porque no era necesario para atender los hechos de aquel caso. Ello no nos impide reconocer esa causal ante unos hechos meritorios. Como dijéramos en aquella opinión, cuando se trata de mantener vivo un esquema constitucional, de conservarlo en buena sintonía con las realidades del país, el principal deber de la judicatura el que sus decisiones propendan a tal fin.

Por tales consideraciones revocaría la sentencia del Tribunal de Apelaciones y devolvería el caso al Tribunal de Primera Instancia para que se le permita a la peticionaria emplazar a su cónyuge, de modo que se le de a éste la oportunidad de comparecer a una vista evidenciaria, para que la peticionaria pueda terminar el

vínculo voluntario que una vez estableció con su pareja con la misma libertad con la que contrajo matrimonio.


Liana Fiol Matta
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Yuserdy Salvá Santiago

    Peticionaria

       v.

                               CC-2006-173

Jason Torres Padró

    Recurrido


Opinión Disidente emitida por la Juez Asociada señora Rodríguez Rodríguez


San Juan, Puerto Rico a 1 de junio 2007

Al filo de los treinta años de la trascendental decisión en *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250 (1978), emitida por voz del Juez Presidente Trías Monge, una mayoría de este Tribunal le da su espalda a lo que ha sido nuestra tradición vindicadora de la intimidad personal, con su empañada visión del alcance de lo allí dispuesto. Con una mirada de corto aliento, la mayoría sostiene que no hay cabida en nuestro ordenamiento para reconocer la ruptura irreparable como una causal disponible para dar por terminado un matrimonio que ha dejado de existir conforme la voluntad de una de las partes.

La Opinión mayoritaria determina que en *Figueroa Ferrer* no se reconoció dicha causal como una separada a la causal de consentimiento mutuo, y que permitir la misma como causal adversativa derrotaría el derecho a la intimidad que se intentó salvaguardar en *Figueroa Ferrer*. La mayoría enfoca sus miras en qué se dijo o no se dijo en *Figueroa Ferrer,* congelando en el tiempo el derecho a la intimidad. Treinta años no pasan en vano. En los albores del siglo XXI y conforme los desarrollos doctrinales en materia del derecho a la intimidad, la respuesta que ofrece este Tribunal a la controversia de marras acusa, como poco, falta de actualidad.

Con el respeto que siempre me merece el criterio de mis colegas, lamento el retroceso que representa la Opinión que hoy anuncian. **Expreso entonces con profunda convicción, mi enérgico disentimiento con el curso trazado.**[54]

**I**

**A**

La raíz del desacierto de la Opinión del Tribunal reside en su renuencia a reconocer cuál es el verdadero alcance del derecho a la intimidad que establece nuestra Norma Fundamental. La visión unidimensional de este derecho que refleja la Opinión de la mayoría conduce la misma al errado resultado a que llega.

---

[54] Tenía razón Oriana Fallaci cuando nos advertía que "hay momentos de la vida en que callar se convierte en una culpa. Hablar, en una obligación. Un deber civil, un desafío moral, un imperativo categórico del cual no te puedes evadir." O. Fallaci, *La rabia y el orgullo*, La Esfera de los Libros, S.L., Madrid, 2002, 7ma ed., pág. 14. Éste es uno de esos momentos.

En innumerables ocasiones nos hemos expresado sobre la importancia que para el libre desarrollo de la persona revisten el derecho a la intimidad y la inviolabilidad de la dignidad humana. Hemos concebido el derecho a la intimidad como "componente del derecho a la personalidad, [que] goza de la más alta protección bajo nuestra Constitución y constituye un ámbito exento capaz de impedir y limitar la intervención de terceros —sean particulares o poderes públicos— contra la voluntad del titular." *López Tristani v. Maldonado Carrero*, res. 8 de septiembre de 2006, 168 D.P.R. ___, 2006 TSPR 143. Es un derecho de índole subjetivo e inherente al ser humano; que no puede, en ningún caso, ser cerrado o estático. *P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328 (1983). Se configura en su esencia, como protección de la autorrealización del individuo.[55] La intimidad es el origen

---

[55] Aquí debemos rechazar la valoración que hace la Opinión de conformidad emitida por el Juez Asociado señor Fuster Berlingeri, respecto el derecho a la intimidad y como éste desvanece cuando dos personas contraen matrimonio. Primeramente, cabe señalar que el derecho a la intimidad en cualquiera de sus vertientes es un derecho de carácter individual. Segundo, y tal vez más importante, es un derecho que no depende del estatus civil de la persona sino que se ostenta en virtud de ser persona. No podemos avalar una tésis que postule que mediante la decisión de contraer matrimonio la persona renuncia a su derecho a la intimidad; resultado lógico de lo propuesto en dicha ponencia.

La visión adelantada en la Opinión de conformidad nos recuerda la figura de la autoridad marital, desterrada de nuestro ordenamiento a partir de la reforma del Derecho de familia del año 1976. De la misma forma que previo al año 1976, la mujer al contraer matrimonio perdía su individualidad para convertirse en un apéndice de su marido, la proposición adelantada en la ponencia, pretende negarle vigencia al derecho a la intimidad —manifestación de esa invidualidad— por el hecho de haber contraído matrimonio. De la misma forma que rechazamos lo primero, debemos rechazar el retroceso que supone lo segundo.

de la diversidad, de la diferenciación y de la pluralidad, por lo que es garantía de democracia y pluralismo. Es, como ha dicho el profesor Rebollo Delgado, "un ejercicio constante de liberalidades." L. Rebollo Delgado, *El Derecho Fundamental a la Intimidad*, Dykinson, S.L., Madrid, 2nda ed., 2005, pág. 119.

Nuestra vasta jurisprudencia sobre el derecho a la intimidad puede reconducirse sin dificultad a uno de dos paradigmas: la intimidad territorial y la intimidad informacional. La primera de éstas "protege espacios o zonas de aislamiento frente a la intrusión de extraños, un 'área espacial o funcional de la persona'." L. J. Mieres Mieres, *Intimidad Personal y Familiar*, Editorial Aranzadi, S.A., Navarra, 2002, pág. 25. La intimidad informacional, por su parte, "tiene por objeto las informaciones relativas a la vida privada de las personas." *Loc. cit.* Son estas dos dimensiones las que mayormente se reflejan en nuestras decisiones.[56]

Existe una tercera dimensión del derecho a la intimidad sobre la cual no hemos abundado en demasía en el pasado.

---

[56] Sobre la primera de estas dos vertientes llamada intimidad territorial confróntese, entre otros, *López Tristani v. Maldonado Carrero*, res. 8 de septiembre de 2006, 168 D.P.R. ___, 2006 TSPR 143; *Pueblo v. Soto Soto*, res. 22 de mayo de 2006, 168 D.P.R. ___, 2006 TSPR 87; *Nieves v. AM Contractors*, res. 2 de diciembre de 2005, 166 D.P.R. ___, 2005 TSPR 181; *Pueblo v. Meléndez*, 148 D.P.R. 539, 550-552 (1999); *Pueblo v. Meléndez Rodríguez*, 136 D.P.R. 587, 597 (1994). Por otro lado, sobre la vertiente de información relativa a la vida privada véase, entre otros, *Rullán v. Faz Alzamora*, res. 13 de enero de 2006, 166 D.P.R. ___, 2006 TSPR 5; *Pueblo v. Loubriel Serrano*, 158 D.P.R. 371 (2003); *Noriega v. Gobernador*, 122 D.P.R. 650 (1988); *Pueblo v. Torres Albertorio*, 115 D.P.R. 128 (1984).

Esta consiste en la intimidad como autonomía en la adopción de decisiones personales. *López Vives v. Policía de P.R.*, 118 D.P.R. 219, 242 (1987) (Naveira Merly, J., Op. concurrente). *Véase*, Mieres Mieres, *op. cit.*, págs. 29-33. Como su propio enunciado sugiere, esta vertiente comporta, necesariamente, el reconocimiento de la libertad individual para la elección y desarrollo del propio plan de vida.[57] *Véase,* M. Galán Juárez, *Intimidad nuevas dimensiones de un viejo derecho*, Editorial Universitaria Ramón Areces, Madrid, 2004, pág. 130 ("la intimidad . . . es el marco adecuado para que el hombre se encuentre a sí mismo, decida por sí y desarrolle por tanto su autonomía . . . [E]s esa 'esfera personal reconocida' que tendría que aceptar todo liberal como punto de partida para la adopción de decisiones sociales.")  El derecho a tomar decisiones importantes sobre la vida íntima o familiar de las personas se configura como mecanismo de desarrollo de la personalidad.[58]   L. Rebollo

---

[57] *Véase, López Rivera v. E.L.A.*, res. 11 de julio de 2005, 164 D.P.R. ___, 2004 TSPR 102; *Rexach v. Ramírez Vélez*, res. 15 de junio de 2004, 161 D.P.R. ___, 2004 TSPR 97; *Belk v. Matínez*, 146 D.P.R. 215 (1998); *Pueblo v. Duarte Mendoza*, 109 D.P.R. 596 (1980).

[58] Hay quienes postulan que estas distinciones no son más que distintas caras de una misma moneda.  Así, el profesor Martínez de Pisón Cavero indica: "En realidad, no es difícil percatarse de que son las dos caras de la misma moneda, el lado individual y el social de la privacy, y de que, en ocasiones, ambos aparecen sólidamente interconectados hasta en los escritos que más se escoran hacia uno u otro lado. … ¿Acaso, en puridad, nuestras acciones y actividades sociales no son una manifestación, un reflejo de lo que sentimos como propio, de nuestro interior, como algo nuestro cuyas posibilidades de acceso de los demás controlamos estrictamente?"  J. Martínez de Pisón Cavero, *El Derecho a la Intimidad en la Jurisprudencia Constitucional*, Editorial Civitas, S.A., Madrid, 1993, pág. 55.

Delgado, *op. cit.*, págs. 121-123. *Véase*, *Lopez Vives, supra.*
Recordemos además, que bajo nuestro orden constitucional la
vida privada o familiar goza de protección.[59]  Constitución
del Estado Libre Asociado de Puerto Rico, Art.  II, sec. 8.

En nuestro ordenamiento, las relaciones de familia se
han analizado por los tribunales en el contexto del derecho a
la intimidad.  *Rexach v. Ramírez Vélez*, res. 15 de junio de
2004, 168 D.P.R. ___, 2004 TSPR 97.  Necesariamente entonces,
la decisión de contraer matrimonio se instaura como reflejo
individualizado de la dimensión de autonomía del derecho a la
intimidad.  "La toma de esta decisión, con quién hacerlo y
cuándo, es un asunto eminentemente personal e íntimo que no
debe estar sujeto a intervenciones o coerciones indebidas,
salvo que medie un interés de gran preeminencia que así lo
justifique."  *Gralau Matos v. Latorre Thelmont*, res. 1ero
diciembre de 2004, 163 D.P.R. ___, 2004 TSPR 192 (Rodríguez
Rodríguez, J., voto concurrente).  Consiguientemente, la
"doctrina es unánime respecto a la singular trascendencia del
derecho a contraer matrimonio tanto en su vertiente positiva
como negativa, catalogándolo sin duda como un derecho humano

---

[59] En *Whalen v. Roe*, 429 U.S. 589, 598-599 (1977), el
Tribunal Supremo de los Estados Unidos reconoció esta
dimensión del derecho a la intimidad, al indicar lo
siguiente:

> The cases sometimes characterized as protecting
> 'privacy' have in fact involved at least two
> different kinds of interests.  One is the
> individual interest in avoiding disclosure of
> personal matters, **and another is the interest in
> independence in making certain kinds of important
> decisions.** (Énfasis nuestro.)

de singular trascendencia." F. Herrero-Tejedor, *La intimidad como derecho fundamental*, Editorial Colex, Madrid, 1998, pág. 17.

**B**

Como sabemos, la Constitución de los Estados Unidos no reconoce expresamente --como es el caso de la Constitución del Estado Libre Asociado-- el derecho a la intimidad. Pero sí ha reconocido que una dimensión del derecho a la libertad de la Decimocuarta Enmienda incluye un área de intimidad personal o individual, al igual que una garantía de la existencia de zonas de intimidad. *Roe v. Wade*, 410 US 113, 152 (1973)("a right of personal privacy or a guarantee of certain areas or zones of privacy.") E. Chemerisky, *Constitutional Law, Principles and Policies*, Aspen Publishers, New York, 2002, sec. 10.2.1, págs. 762-763.

Este derecho a la "intimidad personal" incluye, entre otros asuntos, la toma de decisiones importantes sobre la vida de una persona; una de las cuales es la determinación de contraer matrimonio. A modo de ejemplo, en *Loving v. Virginia*, 388 U.S. 1, 12 (1967), el Tribunal Supremo de los Estados Unidos determinó que la decisión de casarse está contenida en el concepto de libertad de la cláusula de debido proceso de ley y declaró inconstitucional un estatuto del estado de Virginia que proscribía el matrimonio interracial. Explicó que el matrimonio es uno de los derechos civiles básicos del ser humano, fundamental para nuestra propia existencia, por lo que negarlo a base de clasificaciones de

índole raciales infringe la libertad de los ciudadanos sin el debido proceso de ley. Bajo este análisis se ha determinado que, ínsito al concepto de libertad se encuentra también el derecho a establecer un hogar y a procrear hijos. *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Skinner v. Oklahoma*, 316 U.S. 535 (1942); *Zablocki v. Redhail*, 434 U.S. 374 (1978).

Por otro lado, en *Griswold v. Connecticut,* 381 U.S. 479 (1965), el Tribunal sostuvo que violaba el derecho a la intimidad que circunda las relaciones maritales una ley que prohibía el uso y distribución de métodos anticonceptivos. El Tribunal razonó que el derecho a la intimidad no permitía la intromisión del Estado en el lecho matrimonial en busca de evidencia sobre la utilización de métodos anticonceptivos.

Así, a tenor con la jurisprudencia del Tribunal Supremo de los Estados Unidos, el derecho al matrimonio incluye la libertad de tomar decisiones relacionadas al matrimonio. *Carey v. Population Servs. Int.,* 431 U.S. 678, 685 (1977). Siendo ello así, forzoso es concluir que goza de protección constitucional no tan solo esa decisión, la de contraer matrimonio, sino también todas aquellas decisiones que giren alrededor del matrimonio, como la de disolver el mismo. *Véase, Boddie v. Connecticut*, 401 U.S. 371 (1971) ("a State may not, consistent with the obligations imposed on it by the Due Process Clause of the Fourteenth Amendment preempt the right to dissolve [a marriage]. . . without affording all citizens access to the means it has prescribed for doing so.") Véase, *United States v. Kras*, 409 U.S. 434 (1973);

Chemerissky, *op. cit.*, sec. 10.9, pág. 882 ("divorces relate to the constitutional right to marry, a person only could exercise that right if he or she received a divorce from an existing spouse.") *Véase además*, Horowitz, The "Holey" Bonds of Matrimony: A Constitutional Challenge to Burdensome Divorce Laws, 8 *U. Pa. J. Const. L.* 877, 881 (2006).

Conviene apuntar que en *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618-620 (1984), se dispuso que el reconocimiento de una zona de intimidad que cobije las relaciones familiares obedece a que éstas desempeñan un rol social determinante. Es allí donde se cultiva y se diseminan los ideales y valores preciados de la sociedad, fomentando así la diversidad cultural y social necesaria para el desarrollo y crecimiento de una sociedad liberal, democrática y pluralista. El Estado debe abstenerse de intervenir en la esfera familiar pues es allí donde los individuos desarrollan su identidad, elemento esencial de la libertad.

Somos del criterio que el matrimonio no es sólo una institución social, cuya estabilidad interesa a la sociedad, sino también, y, sobre todo, "un cauce al servicio del libre desarrollo de la personalidad de los contrayentes, que, mediante la opción de casarse, expresan, como seres humanos libres y responsables, una decisión íntima, a través de la cual encauzan su existencia." J. R. De Verda y Belmonte, "La personalización del matrimonio en las reformas de 2005", en J. R. De Verda y Belmonte (Coordinador), *Comentarios a las Reformas de Derecho de Familia de 2005*, Editorial Aranzadi,

S.A., Navarra, 2006, pág. 18. Esta es una decisión que entronca, como ya dijimos, en la esfera de autonomía del derecho a la intimidad. Así también debe ser cuando de lo que se trate sea de la voluntad expresa de una persona que ya no desea continuar vinculada a su cónyuge. Una y otra constituyen expresiones sobre el libre desarrollo de la personalidad de cada cual, exigencia de libertad y dignidad del ser humano, cuyo epicentro reside en el derecho a la intimidad en la modalidad que valora la toma de decisiones sobre la vida íntima del ser humano. Ambas decisiones gozan necesariamente de protección bajo la Constitución del Estado Libre Asociado de Puerto Rico.

Pasemos ahora a analizar el modelo establecido en *Figueroa Ferrer*.

## II

A poco que analicemos **con rigor doctrinal** la decisión en *Figueroa Ferrer*, nos percatamos que en la misma se incorporan dos estamentos del derecho a la intimidad como base fundacional para la determinación que se anunciaba. Por un lado, el derecho a tomar decisiones importantes sobre la vida íntima o familiar que se manifiesta cuando el individuo determina divorciarse y por otro lado, el derecho a la intimidad que cobija la información sobre la vida íntima de los cónyuges.

En *Figueroa Ferrer,* reconocimos que el Estado no puede limitar el divorcio a causales derivadas del concepto de la culpa, pues ello violaría el derecho a la intimidad en su

modalidad de autonomía personal, en cuyo caso era imperativo reconocer la causal de consentimiento mutuo como causal no culposa. Sobre este asunto, la Opinión expresó que "[l]as Secs. 1 y 8 del Art. II de la Constitución no permiten limitar los fundamentos del divorcio en Puerto Rico dentro de las circunstancias de este caso a causales derivadas de la culpa. … **La esencia del derecho estriba en la abolición de la noción de culpa.**" (Énfasis nuestro.) *Figueroa Ferrer, supra*, pág. 726. Claramente, **el tribunal tiene que reconocer la causal no culposa de consentimiento mutuo, pues requerir causales culposas violaría el derecho a la intimidad en su vertiente de autonomía personal al supeditar la obtención de un divorcio a la comisión por uno de los cónyuges de alguna de las actuaciones culposas establecidas por ley.**[60]

Dicho de otra forma, en *Figueroa Ferrer* establecimos que el derecho a la intimidad en Puerto Rico cobija la decisión

---

[60] Posteriormente en el caso de *Ex Parte Torres*, 118 D.P.R. 469 (1987), continuamos contrayendo los efectos y la importancia de las causales culposas en los procesos de divorcio. Allí interpretamos el art. 107 del Código Civil, el cual luego de ser enmendado por la Ley Núm. 100 de 2 de junio de 1976, dejó atrás el concepto de la culpa al momento de asignar la custodia de hijos menores. Resolvimos que la enmienda a dicho artículo, junto al reconocimiento del divorcio por consentimiento mutuo, hacen necesaria la figura de la custodia compartida entre ex cónyuges, independientemente de la determinación de culpa que se haya hecho en un proceso de divorcio. Véase además, J. De Witt Gregory, P. Swisher, S. Wolf, *Understanding Family Law*, Lexis Nexis, New Jersey, 2005, 3rd ed. cap. 8.01; Elrod & Spector, Family Law in the Fifty States, 37 *Family L. Q.* 527, 578-580 (2004); Symposium on the America Law Institute's Principles of the Law of Family Dissolution, 4 *J. L. & Family Studies* 1 (2002); Ellman, The Place of Fault in a Modern Divorce Law, 28 Ariz. *St. L. J.* 773, 807-808 (1996); Hill, Equality and Difference: A Perspective on No-Fault Divorce and its Aftermath, 56 *U. Cinn. L. Rev.* 1 (1987).

de divorciarse. Consiguientemente, deshecho el vínculo matrimonial, no existe ningún interés apremiante que le permita al Estado imponerle onerosas cargas a esa decisión. A esos efectos, expresamos en la Opinión: "el Estado está impedido, ..., de obligar a dos seres humanos a permanecer atados . . . ¿Qué interés público existe en mantener un vínculo irremediablemente deshecho?." *Figueroa Ferrer, supra,* pág 275. En esa ocasión la carga coercitiva consistía en que la única forma en que una persona podía divorciarse era si el otro cónyuge incurría en conducta culposa.[61]

Una vez reconocimos en *Figueroa Ferrer* la causal de consentimiento mutuo, establecimos que en estos casos las partes "[n]o necesitan . . . expresar las razones de su decisión si a su juicio ello conlleva la revelación indeseada de penosos detalles de su vida íntima." *Figueroa Ferrer, supra,* pág. 276. El mutuo acuerdo de divorciarse, junto con las estipulaciones requeridas en esos casos, es prueba suficiente para que el tribunal reconozca que los vínculos matrimoniales han quedado rotos. Reclamar que los cónyuges abunden sobre las razones de su decisión no tiene ningún propósito legítimo, por lo que dicha exigencia violaría el derecho a la intimidad de los cónyuges, en su modalidad de intimidad sobre la información personal.

---

[61] Ello no empece la causal de separación pues, como señalamos en *Figueroa Ferrer v. E.L.A.* 107 D.P.R. 250, 276 (1978), "[tampoco] puede forzarse a las partes a vivir ininterrumpidamente separados por dos años como único medio de ejercer su derecho a la intimidad y la inviolabilidad de su dignidad humana."

Lamentablemente, la Opinión que hoy dicta una mayoría de los componentes de este Tribunal, no parece comprender la sutileza que supone el reconocimiento de la modalidad del derecho a la intimidad de autonomía en la adopción de decisiones íntimas o personales, que con tanto cuidado se elaboró en *Figueroa Ferrer*. En contexto de este paradigma, es de todo punto inadmisible descalificar la causal de ruptura irreparable para dar por terminado el vínculo matrimonial. Ello es secuela necesaria de la autonomía en la adopción de decisiones íntimas. **En última instancia, de lo que se habla es de reforzar el principio de libertad de los cónyuges en el matrimonio, pues tanto la continuación de su convivencia como su vigencia, depende de la voluntad constante de cada cual.**

La mayoría circunscribe su análisis a si en *Figueroa Ferrer* se reconoció o no la causal de ruptura irreparable. Lo cierto es que, en puridad, si allí se reconoció o no, es, a fin de cuentas, **irrelevante**. Lo importante no es si la causal de ruptura irreparable encuentra cabida en *Figueroa Ferrer,* sino si la encuentra en el derecho a la intimidad a partir de *Figueroa Ferrer*. La respuesta obvia es que sí.

**III**

**A**

Iniciamos nuestra discusión sobre la validez de la causal de ruptura irreparable recordando nuestras expresiones en *García Santiago v. Acosta*, 104 D.P.R. 321, 324 (1975), las

que nos sirven de trasfondo doctrinal para encauzar la discusión; allí señalamos lo siguiente:

> En la sociedad democrática organizada alrededor de los derechos fundamentales del hombre, el Estado ha de reducir a un mínimo su intervención con sensitivas urdimbres emocionales como lo son las relaciones de familia. La intromisión en la vida privada sólo ha de tolerarse cuando así lo requieran factores superantes de salud y seguridad públicas o el derecho a la vida y a la felicidad del ser humano afectado.

Construyendo sobre lo expresado, en *Figueroa Ferrer*, *supra*, pág. 275, señalamos que aunque el Estado tiene la responsabilidad de velar por la estabilidad de la familia, la guarda y el cuidado de los hijos, la justa división de los bienes gananciales y la adecuada protección de las partes que interesen disolver su vínculo matrimonial, está impedido no obstante, de irrumpir en tales aspectos que son eminentemente personales, salvo que exista un interés apremiante que lo justifique. Véase también, *Rosario v. Galarza*, 83 D.P.R. 167, 174 (1961).

Pasemos a analizar propiamente la controversia de marras.

### B

Un matrimonio está roto irreparablemente cuando por cualquier causa, no importa por motivo de quién se origina, la relación conyugal ha perdido su razón de ser, es decir, han desaparecido los nexos de convivencia matrimonial, sin que exista la posibilidad de que prospere una reconciliación. Nada más se requiere. Esta causal no es de carácter culposa, y su elemento esencial es precisamente esa ruptura del

vínculo matrimonial sin la posibilidad de reconciliación. Véase en términos generales, R. Ortega Vélez, *Mujer Historia y Derecho el Proceso de Divorcio*, Ediciones Situm, San Juan, 1997, págs. 180-181. [62]

La inadmisión de esta causal para disolver un matrimonio, como establece hoy una mayoría de este Tribunal, viola el derecho a la intimidad de los cónyuges en la modalidad de la autonomía en la toma de decisiones íntimas y de trascendencia de la persona. Obliga al cónyuge que ha concluido que se ha roto irreparablemente su vínculo matrimonial a permanecer atrapado en un matrimonio no deseado.

Lo cierto es que, conforme resolvimos en *Figueroa Ferrer*, una vez el vínculo matrimonial está irremediable deshecho, no existe interés público del Estado que exija, para su protección, la imposición de cargas onerosas sobre la intimidad de los individuos. Aquí, la carga por demás onerosa, es que se condiciona el divorcio a la existencia de una causal culposa, sobre la cual el cónyuge que desea divorciarse no tiene control; **lo que ya rechazamos en *Figueroa Ferrer*.** Sorprendentemente, el tribunal no intenta siquiera explicar porque en esta ocasión tal exigencia es válida, cuando no lo fue antes. De otra parte, obliga a ese cónyuge, en ausencia de la causal culposa, a procurar la anuencia del otro para divorciarse utilizando como causal el

---

[62] Véase, González Almeida, *¿Qué adelantamos con el retraso? (La ruptura irreparable como causal de divorcio)*, 41 Rev. Der. Puertorriqueño 315 (2002).

consentimiento mutuo, supeditando el ejercicio de su libertad a la voluntad de otro a quien ya no le unen lazos afectivos. Vemos entonces cómo bajo ambos supuestos, el ejercicio de la libertad del individuo se sujeta y condiciona a la voluntad de su otro cónyuge.[63]

Además, al reconocer la causal de ruptura irreparable relevamos a las partes del requisito de liquidar la sociedad legal de gananciales como condición para acceder al divorcio, tal y como lo impusimos para el divorcio bajo la causal de consentimiento mutuo.[64]   Huelga una expresión sobre la dificultad y aflicción que conlleva el divorcio para los cónyuges, aun cuando éstos así lo deseen.   Rodear ese proceso con el requisito de que se tienen que poner de acuerdo sobre la distribución de los haberes de la sociedad, es imponer cargas emocionales adicionales sobre los cónyuges que se traducen, en demasiadas ocasiones, en la semilla que germina en nuevas discordias y litigios.

Estas estipulaciones se han convertido en "una de las áreas más problemáticas en la administración de la Justicia

---

[63] Esto es precisamente lo que ha ocurrido en este caso donde la peticionaria no ha logrado acordar con el recurrido las estipulaciones necesarias para viabilizar un divorcio por consentimiento mutuo, y clama por un mecanismo que le permita conferirle actualidad legal a la realidad que vive que es, que su vínculo matrimonial ha dejado de existir. **Este hecho, medular a la controversia ante nuestra consideración, ha sido omitido en la ponencia suscrita por la mayoría.**

[64] A nuestro juicio, queda por definirse la verdadera naturaleza del "acuerdo transaccional" sobre la liquidación de la sociedad legal de gananciales y las pensiones alimenticias que hemos impuesto para los casos de divorcio por consentimiento mutuo.   Ello así, en atención al peculiar contexto en que el mismo se origina que lo distingue de la transacción ordinaria.

en Puerto Rico por razón del gran número de asuntos que genera ante los tribunales." *Ex parte Valencia*, 116 D.P.R. 909, 910 (1986). Así lo demuestra la experiencia de los últimos años. *E.g., Rivera Rodríguez v. Rivera Reyes*, res. 20 de junio de 2006, 168 D.P.R. \_\_\_, 2006 TSPR 103; *Náter v. Ramos*, res. 23 de julio de 2004, 161 D.P.R. \_\_\_, 2004 TSPR 130; *Mc Connell Jiménez v. Palau Grajales*, res. 5 de mayo de 2004, 161 D.P.R. \_\_\_, 2004 TSPR 69; *Igaravidez v. Ricci*, 147 D.P.R. 1 (1998); *Magee v. Albeiro*, 126 D.P.R. 228 (1990); *Ex parte Negrón Rivera y Bonilla*, 120 D.P.R. 21 (1987). Ello no nos debe sorprender porque como indicamos en *Náter v. Ramos, supra,* con gran atino, "los acuerdos pueden estar motivados por la carga emocional envuelta en lograr la pronta disolución del matrimonio o la ventaja económica o intelectual de uno de los cónyuges tenga sobre el otro."

Advertimos finalmente, que en nuestro ordenamiento la única forma en que los individuos pueden obtener un divorcio es mediante un procedimiento judicial. El Estado no puede entonces, negarle a un cónyuge el acceso al procedimiento judicial sin articular algún interés apremiante, pues se trata de vindicar el derecho a la intimidad en su dimensión de autonomía.[65] La mayoría en su Opinión no articula con

---

[65] Con relación al planteamiento sobre el debido proceso de ley en su acepción procesal contenido en la Opinión mayoritaria, el mismo es a todas luces improcedente. Como poco, la mayoría no expresa cuál es el derecho libertario o de propiedad que se le priva a una persona reconociendo la causal de ruptura irreparable. La ausencia de tal derecho, hace inaplicable el reclamo de debido proceso. No hay duda que el Tribunal no ha sabido articular en qué consiste este mandato constitucional. Véase, J. Nowak, R. Rotunda,

ningún rigor cuál es ese interés apremiante.[66]  La ausencia

de la causal de ruptura irreparable niega el acceso al

---

*Treatise Constitutional Law*, Thomson/West, St. Paul, 1999, 3rd. ed., sec. 17.2; E. Chemerinsky, *Constitutional Law Principles and Policies*, Aspen Publishers, New York, 2002, 2nd ed., sec. 7.2.

[66] En un fallido intento de última hora, la mayoría pretende solventar este vacío aseverando que "debe quedar claro que la protección de la unión matrimonial, en efecto, **constituye un interés apremiante del Estado.**" (Énfasis en original.)  Lo primero que llama la atención de tan aventurada aseveración en el contexto de este caso, es que la opinión que se cita en apoyo a la misma nada tiene que ver con lo planteado en la controversia que hoy nos toda resolver.  Ello ejemplifica la ausencia de rigor de la Opinión que hoy suscribe la mayoría.

De otra parte, si fuéramos a considerar con seriedad el contenido y alcance de tal aseveración, habría que desterrar de nuestro ordenamiento legal el divorcio, como apostasía de fe.  En una sociedad donde la unión matrimonial constituye un interés apremiante del Estado, no puede haber cabida para el divorcio, la antinomia de esa unión.  En estricto derecho, procedería que la mayoría declara inválida las otras causales o nos explicaran por qué son válidas frente a ese interés apremiante.  Ciertamente, si evitar el divorcio gozara en realidad del cariz que pretende impartirle la mayoría, no podrían existir las causales que lo viabilizan, o sea, no existiría el divorcio.

Nuevamente, la mayoría no ha sabido, o no ha querido, leer correctamente *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250 (1978).  En *Figueroa Ferrer, supra*, pág. 275, establecimos que a nombre de la estabilidad de la familia, la guarda y cuidado de los hijos, la justa división de los bienes gananciales y la adecuada protección de las partes que disuelven su vínculo matrimonial, **el Estado está impedido de obligar a dos seres humanos a permanecer atados cuando no lo desean.  Dicho de otra forma, el Estado no puede utilizar ninguno de estos intereses apremiantes para evitar la disolución del matrimonio.**

En vista de lo anterior y ante la imposibilidad de la mayoría de identificar algún interés verdaderamente apremiante que justifique la intervención del Estado para negarle reconocimiento a la ruptura irreparable como causal viable para el divorcio, la opinión mayoritaria desoye a *Figueroa Ferrer* y se aventura a reconocer como valor apremiante la protección de la unión matrimonial *per se.* Para la mayoría entonces es un interés apremiante evitar que las personas se divorcien.  Nos parece lastimoso al igual deplorable que en su afán de justificar la decisión a la que se llega, se esboce tan obtusa e indocta normativa. **Tal parecería que los integrantes de la mayoría han quedado atrapados en una sociedad donde privan los valores**

tribunal y evita el ejercicio del derecho a la intimidad, lo que es claramente inconstitucional.

Cierro como comencé, expresando mi profunda decepción con el proceder de una mayoría de los integrantes de esta Curia. Hoy, este Tribunal a la usanza de *Dred Scott* y *Korematsu*, escribe una de sus más tristes páginas. **Le recuerdo a la mayoría, que los derechos no son graciosas concesiones sino conquistas de libertad.**

Por las razones que expreso, **disiento enérgicamente** del proceder mayoritario; por contra, resolvería que la causal de ruptura irreparable está disponible para obtener un divorcio en Puerto Rico, sin mayor exigencia que la voluntad expresa de uno de los cónyuges.

                              Anabelle Rodríguez Rodríguez
                                    Juez Asociada

---

**decimonónicos y quieren a toda costa que les acompañemos. Rehúso darle marcha atrás al reloj.**